(No. 28091.—▮▮▮▮▮▮▮▮▮)
*In re* BENJAMIN P. ALSCHULER, Attorney, Respondent.

*Opinion filed Nov. 22, 1944—Rehearing denied Jan. 15, 1945.*

Amos M. Pinkerton, of Taylorville, for the Illinois State Bar Association.

L. G. Pefferle, of Springfield, and Werner W. Schroeder, of Chicago, for respondent.

Mr. Justice Smith delivered the opinion of the court:

This proceeding originated in a resolution passed by the Board of Governors of the Illinois State Bar Association. The resolution authorized the General Committee on Grievances to institute an investigation into the conduct of respondent, as an attorney. As a result of the investigation, a complaint was filed by the grievance committee. A copy of the complaint was served on respondent, to which he filed his sworn answer.

The charges in the complaint may be summarized as follows: that in 1933, respondent accepted employment by certain public utility companies affiliated with the Union Electric Company of Missouri; that he entered into a contract with Frank J. Boehm, who was vice-president of said Union Electric Company, under which contract, respondent was to be paid an annual retainer of $38,000; that he agreed to refund, pay or deliver to Boehm or to other officers or agents of the utility companies, designated by him, in cash, the sum of $19,000 per annum; that under said contract he received the sum of $38,000 per annum in the years 1933 to 1938, inclusive; that he re-

turned or refunded the sum of $19,000 each year to Boehm or to other officers or agents of said utilites, designated by Boehm, in cash; that by this practice the utilities were enabled to establish a large fund to be used in a secret manner, and which was not shown on their books; that upon an investigation by certain officials of the United States government, respondent made conflicting, false and contradictory statements in explanation of said transactions, some of which statements were made under oath with knowledge of their falsity; that the acts of respondent were extraordinary and were such as to indicate knowledge on his part that the payment of the $38,000 annual retainer, and the return by him of $19,000 each year, were made for the purpose of establishing a fund to be used by the officers of such utilities in a secret manner so that the refunds would not appear on the books of the utilities, or be known to the officers and agencies of the government having jurisdiction over the operations and records of the utility companies.

In respondent's sworn answer to the complaint, he admitted making the contract with Boehm. He alleged that the contract was made with Boehm as vice-president of eight Illinois utility corporations, which were subsidiaries of the Union Electric Company of Missouri; that said contract was for services to be rendered in behalf of said Illinois companies in matters arising under the Public Utilities Act of Illinois and cases filed before the Illinois Commerce Commission, and other services in connection with such matters; that his arrangement with Boehm was that all petitions which were to be filed with the Illinois Commerce Commission, all leases and contracts with the companies for which respondent's services were engaged, and all other papers requiring such services were to be prepared by other attorneys employed by the companies and submitted to respondent for his approval or disapproval; that such other attorneys were to be compensated by re-

spondent refunding to Boehm or others, designated by him, one half of the annual retainer fees, which arrangement he alleged was carried out from 1933 to 1938, inclusive; that he kept no books or accounts of such refunds, except temporary memoranda of such items as he deemed necessary to record, which memoranda were retained by him until such time as he no longer required them. His explanation in his answer as to why the refunds were made in cash is, that throughout the years of 1932 to 1939, inclusive, all of his major financial payments of every kind were made in cash; that during said years he carried only small bank balances; that he handled his business in this way because of the fact that he was involved financially and did not desire to carry any large balances in banks; that during all of said years he believed that, pursuant to his agreement, the money refunded or paid by him to Boehm and the other officers of the utilities was used for the payment of compensation to other attorneys; that he did not know and at no time suspected that it was used to establish a secret fund.

The answer admits that when he was first interviewed by a representative of the Securities and Exchange Commission he falsely stated to said investigator that he had not at any time made such refunds or any part thereof. He further alleged that he did this because he felt it was his obligation as an attorney not to give information to others concerning the refunds; that after the matter under investigation became public, he revealed to this investigator the fact that such refunds were made and the facts concerning the payments; that when he was interviewed on the first occasion by the investigator, he considered that he was fully justified in his actions and was fulfilling his duties as an attorney to his client by not revealing the facts until he was advised that his client had given the information sought. His answer concluded with the denial that any of his conduct referred to was in any manner unpro-

fessional or unethical. He alleged that it was his belief that he acted as a business man, honorably and in the best interest of all with whom he had dealings, and as an attorney in a manner entirely ethical and professional.

After hearing the evidence on which the case was submitted, the grievance committee filed a report with the Board of Governors of the State Bar Association, finding respondent guilty of unprofessional conduct which tends to bring the profession into disrepute. Exceptions to this report were filed and heard by the board of governors. The exceptions were overruled and the report of the grievance committee approved. Pursuant to this action, the board of governors, acting as commissioners under Rule 59 of this court, filed herein its report, finding respondent guilty of unprofessional conduct tending to bring the profession into disrepute and recommending that his name be stricken from the roll of attorneys of this court. Respondent has filed exceptions to the report and has brought the record here for review.

Due to respondent's physical condition he was unable to appear on the hearing before the grievance committee without endangering his health. By stipulation and agreement of the parties a photostatic copy of the transcript of the testimony given by respondent before a Federal grand jury, a photostatic copy of the testimony given by respondent in the case of the *United States* v. *Boehm,* 123 Fed. 2d 791, and the sworn answer of respondent herein, were admitted in evidence as the sworn testimony of respondent. By the stipulation these documents were to be given like force and effect as if the testimony contained therein had been given by respondent on the hearing. All objections were waived, except as to the materiality and relevancy of the testimony contained in the documents.

It appears from the sworn answer of respondent and from his testimony, which was admitted in evidence in this case under the stipulation, that respondent has been

engaged in the practice of law in the city of Aurora since his admission to the bar by this court in 1899; that in 1933, he entered into a contract with Boehm under which he was to be paid an annual retainer fee of $32,000 for the year 1933; that as a part of the contract he agreed to refund or pay to Boehm, or to others designated by him, one half of the retainer fee so paid. The agreement was that the portion of the retainer fees which respondent agreed to pay or refund to Boehm was to be paid by him in cash; that for the years 1934 to 1938, inclusive, the agreement was that he was to be paid an annual retainer fee of $38,000; that in the year 1933, he refunded or paid to Boehm, in cash, the sum of $16,000, and that in each of the years 1934 to 1938, he likewise paid or refunded to Boehm, or to other officers of the companies designated by Boehm, the sum of $19,000 in cash; that these annual retainer fees were paid to him by checks of the utility companies; that in making his annual Federal income tax returns, he treated the entire amount of the retainer fees as fees and income received by him, and paid income taxes thereon, making no deductions for the refunds. Some of the refunds of cash were made in St. Louis, some in Aurora, some in Springfield and some in Chicago. The total amount refunded or repaid was $111,000.

That the contract was made as above indicated, and that the refunds were made is admitted and not in dispute. The only question here involved is the purpose and effect of the agreement and the payment of the refunds and respondent's conduct in connection therewith. As respondent designated it in his answer and in his testimony, this was indeed an unusual and abnormal transaction.

In January, 1938, a representative of the Securities and Exchange Commission called upon respondent at his office in Aurora. Respondent testified that this representative exhibited his credentials as a representative of the Securi-

ties and Exchange Commission and produced and served on him a subpoena and a subpoena *duces tecum*. He was sworn by the investigator and examined. In that examination he denied positively that there was any agreement that he was to refund or "kick back" any part of the retainer fees, and denied that any part of such fees were refunded or paid to Boehm or anyone else. Shortly after making this statement, respondent reported to Boehm what had occurred in his office. Boehm requested him to go through his files and get rid of all incriminating papers which might be in those files.

Some time later respondent was examined in St. Louis by the same and one other investigator for the Securities and Exchange Commission. At that time he was also placed under oath. He was advised by the examiners that they had evidence which indicated that respondent's former statement denying that refunds were made was false and that they were giving him the alternative of still denying it or admitting it. He refused to answer the questions propounded to him until he was granted immunity from prosecution under the Securities and Exchange Act. After he was granted such immunity by the general counsel of the Securities and Exchange Commission, he testified. He then admitted that the refunds were made and that he had testified falsely on his former examination that such refunds were not made. Later he testified before the Federal grand jury in St. Louis and in the trial of the case of *United States* v. *Boehm* in the Federal court in St. Louis. In that case Boehm was on trial for perjury in falsely testifying before an investigator of the Securities and Exchange Commission that no part of the fees paid to respondent and others were refunded or paid to him. In his testimony in the Boehm trial, respondent testified to the making of the contract and to the payment of the refunds the same as he had previously testified before the investigators in St. Louis. On neither of those occasions

when he was examined and testified with reference to the contract and refunds, did he make any claim or suggestion that the purpose for which the refunds were to be made was the payment of other attorneys for services rendered in connection with matters respondent was handling for the utility companies.

He was called before the Federal grand jury at Springfield in November, 1940, and examined. This was the fifth occasion on which he testified concerning the contract, the payments received by him under the contract, and the refunds made by him. The record shows that on that occasion he, for the first time, made the claim that the agreement was that the refunds were to be used for the purpose of paying other attorneys.

It is earnestly insisted by counsel for respondent in this court that the refunds under the contract were to be made, and were actually made, for the purpose of paying other attorneys employed by the utility companies for the preparation of petitions and other papers prepared by them for use in matters handled by respondent. It is argued that in this state of the record the case merely presents the question of a division of fees between attorneys for services rendered which, counsel insist, was a legitimate transaction. If the purpose of the refunds was to pay other attorneys employed by the utility companies for services rendered, it is inconceivable that the transactions would have been handled in the way in which they were handled. If the utility companies had other attorneys employed to render services in connection with the business being handled by respondent, why were such attorneys not paid by those companies direct? Why was it necessary that respondent be paid double the amount he was to receive for his services upon his agreement to thereafter refund one half of the amounts in cash to Boehm or other officers of the company? It is also inconceivable that respondent would have handled a legitimate transac-

tion of that kind without keeping books and making and preserving a record of such transactions. This testimony of respondent as to the purpose of the refunds is so fantastic as to render his entire testimony incredible, except in so far as it constitutes admissions against his interests. This court is not so oblivious to the methods in which legitimate business is ordinarily conducted as to accept respondent's belated explanation of the transaction, given for the first time nearly two years after the investigation was begun.

Even though respondent had no actual notice or knowledge of the ultimate use to be made of the refunds, and even if his testimony that he had no such knowledge could be believed, the court cannot assume that a lawyer of his experience and standing could not, and did not, know that such refunds were to be used for illegal purposes. He admits in his testimony that he knew when he made the contract and when the refunds were made in cash that it could not have been entirely for legitimate purposes; that he "might" have had his "suspicions;" that it was improper for him to include in his income tax returns the portion of the retainers refunded; that he knew it was not a normal business transaction and that he knew from the scheme and plan under which he turned back one half of the retainer fees in cash that it might result in an illegitimate use of the funds. These admissions demonstrate conclusively that he fully realized that he was a party to a fraudulent scheme and was fully conscious of its purpose.

The record further shows that he refunded $7500 in May, 1939. This was after the investigation was started. It was some months after he had been examined in his office concerning the transaction. It was long after the whole transaction, including the use made of the refunds, had been given publicity. At that time respondent definitely knew the use which was being made of the refunds. It is now claimed that the $7500 returned to Boehm in

May, 1939, was in part payment of money borrowed by him from Boehm, for which he gave his note in 1938. The record does not support this contention. The note on which he claims the $7500 was a payment, was for $11,000. This refund was made in May, 1939. The correspondence in the record between respondent and the attorney for Boehm in October and November, 1940, shows that Boehm had then agreed to accept in full payment of the note the sum of $5000. It is obvious that if he had paid $7500 on the $11,000 note in May, 1939, the amount due on the principal of the note in November, 1940, was only $3500. Respondent's theory leads to the absurdity that he compromised the debt by the payment of $5000, when the total amount due on the note, both principal and interest, could not possibly have been but slightly more than $4000.

The very nature of the transaction was such that respondent must have known, and we are compelled to assume that he did know, the illegality of its purpose. Even though he had no actual knowledge of the ultimate purpose for which the refunds were to be used, the fact that the refunds were to be made in cash was sufficient to put respondent on notice that the purpose was not legitimate. Respondent knew when he entered into the contract, as testified to by him, that by refunding one half the amounts received, these refunds were thereby being handled in a way that their receipt by Boehm, or by the utility companies, would not be reflected upon the books of those companies and that the receipt of the refunds and the purposes for which they were ultimately used would be concealed from the public officials having supervision over the utility companies.

With reference to the false and contradictory statements made by respondent concerning the refunds, it is insisted that there is no evidence in the record that the investigator of the Securities and Exchange Commission, who examined respondent in January, 1939, was author-

ized to administer an oath, and that this charge in the complaint must be disregarded for that reason. To this contention it is a sufficient answer to say that respondent is not here being tried for perjury. Whether he took an oath before an officer authorized to administer oaths, and gave testimony upon which perjury could be assigned, are wholly beside the question. We are concerned here only with his integrity and his moral character. Technically, of course, he could not be convicted of perjury without proof of the authority of the officer administering the oath. But, here, he is not charged with the crime of perjury in the technical sense. He is charged with making false and contradictory statements concerning the refunds. It makes no difference whether he was under oath or not. He admitted repeatedly in his testimony that he did make such false statements. The justification which he attempts to set up for so doing fails to exonerate him. He was a voluntary party to a fraudulent and vicious transaction which he attempted to conceal by falsehood.

Conduct which violates the rules or ethical code of the legal profession, or which is unbecoming a member of the profession in good standing, is unprofessional conduct. Any conduct of an attorney which necessarily tends to bring discredit upon the profession is an abuse of the privilege secured to him by his license. To constitute cause for disbarment or discipline, the conduct of an attorney need not necessarily amount to a crime or misdemeanor. (*People ex rel. Chicago Bar Ass'n* v. *Berezniak,* 292 Ill. 305.) The standard of professional integrity applicable to those admitted to practice is not satisfied by such conduct as merely enables them to escape the penalties of the criminal laws. *In re Sanitary District Attorneys,* 351 Ill. 206; *People ex rel. Chicago Bar Ass'n* v. *Gorman,* 346 Ill. 432.

With the privilege which this court enjoys of placing the names of suitable persons upon its roll of attorneys

comes the responsibility of disciplining such of those officers as commit acts which tend to bring reproach upon the legal profession. It is essential to the orderly administration of justice that the integrity and responsibility of the bar be maintained. To the extent that this court has guaranteed the fitness of one to assume the responsibilities of a member of the bar, it is its duty to recall its certificate whenever it is clearly proved that the holder of a license is no longer worthy of being entrusted with those trusts and confidences which the license indicates he is worthy to assume. (*People ex rel. Chicago Bar Ass'n* v. *Hansen,* 316 Ill. 502; *People ex rel. Chicago Bar Ass'n* v. *Czarnecki,* 268 Ill. 278.) That which an attorney does knowingly and which is contrary to justice, honesty and good morals, involves moral turpitude. *In re Carr,* 377 Ill. 140; *In re Needham,* 364 Ill. 65.

An attorney is an officer of the court, sworn to aid in the administration of justice and to act in good faith in all legal matters. His clients, the court and the public alike, have a vital interest in his integrity and are entitled to require that he shun even the appearance of any fraudulent design or purpose. *In re Tuttle,* 371 Ill. 153; *In re Ellis,* 371 Ill. 113; *In re Huff,* 371 Ill. 98; *People ex rel. State Bar Ass'n* v. *Jadrich,* 320 Ill. 344.

This court has always held that a high sense of personal and professional integrity must be observed by members of the profession. They are a part of the machinery of law for the administration of justice. It is indispensable that the court shall, in a large measure, be able to rely upon their good faith and honesty. It is no hardship to make this requirement and it cannot be relaxed without detriment to the proper administration of justice. (*People ex rel. Healy* v. *Barrios,* 237 Ill. 527.) Good moral character in attorneys includes honesty and the practice of good morals in all their dealings. Fraud consists of anything calculated to deceive, whether it be the suppression

of truth or the suggestion of what is false, and whether it be by direct falsehood or by innuendo, by speech, or by silence. *People ex rel. Chicago Bar Ass'n,* v. *Gilmore,* 345 Ill. 28.

It is true, as suggested by counsel for respondent, upon the facts, this case is one of first impression. It has no precedent in this court. The cases more nearly in point are the so-called *Malone cases.* (*In re Tuttle,* 371 Ill. 153; *In re Ellis,* 371 Ill. 113; *In re Huff,* 371 Ill. 98.) But the lack of precedents does not alter the duty of the court. This court has, at all times, adhered to the principle that an attorney who enters into or becomes a party to a fraudulent scheme for an unlawful purpose, and who is shown to be lacking in honesty and integrity, is guilty of unprofessional conduct.

The conduct of respondent in entering into a contract under which one half of the retainer fees lawfully paid to him in an open and legal manner by the utility companies were to be secretly refunded by him in cash to Boehm and other officers designated by him, and his false statements thereafter made in an effort to conceal the transaction, constitute conduct unbecoming a member of the bar in good standing. Upon his own testimony he has demonstrated an utter departure from the standard of honesty and integrity required of a member of the bar. The misconduct and the fraudulent and dishonest motive accompanying it, are established by clear and satisfactory proof. This is sufficient. (*People* v. *Hansen,* 316 Ill. 502.) He is guilty of unprofessional conduct which tends to bring the legal profession, the courts and the administration of justice into disrepute.

Mindful of the rule that the power to discipline an attorney, because of the serious consequences which follow, should be administered with moderation, and on account of the age of respondent and his previous good

standing at the bar, we are not disposed to strike his name from the roll of attorneys of this court. He is, nevertheless, subject to substantial discipline.

Respondent is suspended from the practice of law in this State for the period of three years.

*Respondent suspended.*