(No. 33603.—

IN RE LORAN S. CLARK (licensed to practice law as Loran Simeon Clark), an Attorney.

*Opinion filed March 22, 1956—Rehearing denied May 22, 1956.*

DAVIS, J., HERSHEY, C.J., and SCHAEFER, J., specially concurring.

CHARLES LEVITON, of Chicago, *amicus curiae.*

LORAN S. CLARK, *pro se.*

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

The board of managers and the committee on grievances of the Chicago Bar Association, as commissioners of this court under Rule 59, have filed a report finding the respondent, Loran S. Clark, guilty of unprofessional conduct as an attorney, and recommending that he be disbarred and his name stricken from the roll of attorneys. Respondent has filed exceptions to the report.

The finding and recommendation are predicated upon

four separate complaints, each charging the conversion to his own use of moneys entrusted to respondent for others. Eight complaints, designated as counts I through VIII, respectively, were investigated by the commissioners. They dismissed counts IV and V. As to counts I and VII the commissioners concluded the evidence would not warrant any discipline greater than censure, and no discipline was recommended on these specifications. It would serve no useful purpose to set out in detail the evidence concerning the complaints dismissed by the commissioners and those upon which no recommendation was made, and we shall discuss only the four instances relied upon by the commissioners in support of their recommendation.

On January 26, 1953, respondent represented Werner Danielson, who entered into a contract on that date to sell a tavern business to Edwin A. Johnson for the sum of $2200. The contract recited payment of $200 as earnest money deposit to respondent, who signed the agreement as escrowee, and provided for payment of the balance of $2000 upon consummation of the sale, to occur not later than five days after the date of the agreement. By the terms of the contract the sale was conditioned upon the parties obtaining for the buyer a lease for a period of at least three years at a monthly rental not to exceed $115. It was provided that if the parties were unable to obtain such a lease for the buyer, the transaction was to become null and void at the option of the buyer and the deposit returned to him. The owner of the building refused to give a lease on the terms recited in the contract between Danielson and Johnson, and the latter then demanded of respondent that he return the $200 deposit. Respondent replied that it was downtown in a safety deposit box and he would return it on February 4 at the tavern. On that date Johnson and his attorney came to the tavern, at which respondent's client was also present, but respondent failed to appear. Several weeks later Johnson met respondent at another tavern and asked him for

the money. Respondent told Johnson not to bother him. Thereafter Johnson repeatedly tried without success to reach respondent at his office and at his home. At the time of the hearing, more than a year after the transaction in question, respondent said he still had the $200 in his possession. To justify retention of the money respondent testified, without supplying details, that it was Johnson's fault the sale was not consummated; that his client had suffered damages as a result; that he was holding the deposit for his client as well as for Johnson; and that he claimed a lien on the $200 for his attorney's fees.

On the Hunter specification the evidence showed that in the spring of 1952 Irene Hunter employed respondent to represent her in connection with the estate of her deceased husband, whose will had left his entire estate to one Samuel Miller. Mrs. Hunter executed a power of attorney authorizing respondent "to execute my name on all documents, checks and papers and do whatever is necessary in the Estate of Martel Hunter, Deceased." To avoid a will contest the attorney for the estate entered into an arrangement with respondent whereby Mrs. Hunter was to receive one third of the estate. In response to her request for a partial distribution, the respondent, on June 2, 1953, obtained a check for $100 payable to his client. He endorsed the check by signing the name of the payee and of respondent as "Atty for Hunter Est." He thereupon cashed the check, but the proceeds were not delivered to Mrs. Hunter until February, 1954, after she had made her complaint to the committee on inquiry of the Chicago Bar Association and had testified.

Mrs. Hunter testified that after May, 1953, she attempted to reach respondent by telephone "and he was never home." An attorney who did some work for the estate testified that during a period of four or five weeks before the estate was closed in September, 1953, he called

respondent many times but never received a response, and wrote one or two letters which were not returned.

After Mrs. Hunter had made her complaint, respondent wrote a letter to the bar association stating in part that "No distribution in the estate has been made, however, I made arrangements with Mr. Sullivan for them to forward Mrs. Hunter $100.00, which she may have at any time. I never have taken any retainer from Mrs. Hunter. In reference to her assertion as to my disappearing will say that I have been out of town practically two months during the summer vacation time; most of time spent being on business." In explanation of his statement that he had "made arrangements with Mr. Sullivan for them to forward Mrs. Hunter $100.00," respondent testified that "Sullivan said her share would be around $200.00 and I told him to send her the other $100.00. This was on October 6th and Sullivan set the matter down for October 13th. The $100.00 I had reference to is the $100.00 I got. I said I made arrangements with Sullivan to send it to her direct." He further testified that when he stated no distribution had been made he was referring to the final distribution and not the partial distribution he had received, that he did not write any letter to Mrs. Hunter advising her he had the money, but that after cashing the check he called her home and told her mother to make an appointment with him to come and get it.

The next specification involves Leo Hausman, Sr., whose son held a contract jointly with his former wife for the purchase of certain real estate. They were being pressed for the balance due on the contract, and in June, 1952, Leo Hausman, Sr., consulted respondent about securing title to the lot and thus salvaging the money his son had paid on it. He requested respondent to find out how much would be required to obtain a deed. After two or three weeks respondent informed him it would take $504.99,

and a check for that amount was delivered to respondent for that purpose. Respondent said he cashed the check and placed the money in his vault in an envelope. Thereafter Hausman repeatedly called respondent without result, and in October, 1953, he finally requested respondent to return the money so that Hausman could handle the matter himself. Respondent replied that he did not have it at that time. On February 19, 1954, after complaint had been pending and Hausman had first testified before the commissioners, respondent's wife finally paid the money to the attorney for the vendor.

As excuse for his failure to carry through the transaction respondent testified that he had been trying for a year to secure a quitclaim deed from the former wife of Hausman's son, in order to enable the vendor to give good title; that she had been seeking to set aside the divorce decree and was antagonistic toward Hausman, Jr., and respondent, who had represented him in the divorce; and that she did not sign the quitclaim deed until October, 1953. He further testified that after December, 1953, he offered to return the money to Hausman, Sr., but the latter insisted upon interest, which respondent refused to pay.

The final specification relied upon by the commissioners discloses that on December 6, 1948, Nell G. West retained respondent to handle the probate of her deceased husband's estate. She paid him a retainer of $85. At various times thereafter she paid him a total of $167 for publishing expense and executor's bond. After September, 1949, Mrs. West repeatedly requested him to close the estate. In November, 1952, Mrs. West called respondent, who came to her home. She asked him when he was going to close the estate, and respondent admitted he had been lax about the matter. Mrs. West then stated she would not give him any more funds for bond premium or expenses. In that year respondent filed a final account and closed the estate subject to filing vouchers. Finally, after the hearings in

this proceeding had begun, Mrs. West delivered to respondent the sum of $116.65 for the balance of bond premium, costs and expenses, which were thereafter paid and the necessary vouchers filed. It is undisputed that the estate was valued at $20,000; that the only fee received by respondent was the $85 initial payment; and that the total sum of $167 advanced by Mrs. West for costs and expenses were insufficient to pay them in full. The commissioners take the position that the funds advanced for specific purposes should have been promptly applied to them even though further costs were needed to close the estate, and that failure to do so shows respondent converted the sums to his own use.

The commissioners, on the record made, have recommended the severest disciplinary action on the ground, apparently, that an intent to wrongfully convert funds to his own use can be inferred from the repeated instances of delay and negligence in properly applying them to the purpose for which they were entrusted. We have repeatedly held that the wrongful conversion by an attorney of funds placed in his hands for a specific purpose involves moral turpitude and is a flagrant violation of his duties, clearly warranting disbarment. *In re Thomson,* 3 Ill.2d 308; *In re Rosenberg,* 413 Ill. 567; *In re Yablunky,* 407 Ill. 111; *In re Koptik,* 406 Ill. 141; *In re Rieger,* 402 Ill. 483.

Rule 59 of this court provides for investigations concerning practices of attorneys "which tend to defeat the administration of justice or to bring the courts and the legal profession into disrepute." (Ill. Rev. Stat. 1951, chap. 110, par. 259.59.) To warrant disciplinary action it is not necessary to show fraud, deceit, or as apparently assumed by the *amicus curiae,* a wrongful conversion of funds entrusted for a specific purpose. (*In re Veach,* 1 Ill.2d 264, 272; See *In re Goldstein,* 411 Ill. 360, 366.) "The standard of professional integrity applicable to those admitted to practice is not satisfied by such con-

duct as merely enables them to escape the penalties of the criminal laws." (*In re Alschuler,* 388 Ill. 492, 502.) Any conduct of an attorney which necessarily tends to bring discredit upon the profession is an abuse of the privilege secured to him by his license, and if persisted in will constitute sufficient cause for disbarment.

One cannot read the present record without being convinced that respondent has been guilty of glaring procrastination, delay and inattention to the matters entrusted to him. His failure to return the $200 deposit involved in the Johnson specification is inexcusable. His neglect to make ordinary arrangements for his long periods of absence, as exemplified in the Hunter specification, is highly inconsiderate and shows gross carelessness in the performance of his duties. Procrastination of the type exhibited in the Hausman specification, and the loose, careless and dilatory practices followed by respondent in the conduct of matters entrusted to him, can hardly fail to bring the legal profession into disrepute. Respondent's repeated failure to recognize the sacredness of his duties and the necessity for irreproachable conduct in his profession evidences a moral obtuseness which his feeble explanations are totally insufficient to mitigate. We have heretofore observed that "To the extent that this court has guaranteed the fitness of one to assume the responsibilities of a member of the bar, it is its duty to recall its certificate whenever it is clearly proved that the holder of a license is no longer worthy of being entrusted with those trusts and confidences which the license indicates he is worthy to assume." (*In re Alschuler,* 388 Ill. 492, 503.) It is vital to the well-being of society and the administration of justice that attorneys, who are officials of the court and a part of our judicial system, should maintain the most scrupulous care in conducting themselves, and should discharge their duties in such manner as will secure and preserve the respect and confidence of the public. The trust and confidence which his clients must necessarily

repose in an attorney require in him a high standard and an appreciation of his duties to them, to his profession, and to the public.

We are not unmindful of the fact that because of the serious consequences to him, the power to discipline an attorney should be administered with moderation. But his clients, the court and the entire profession all have a vital interest in his integrity and the conscientious performance of his duties, of which obligations he could at any time be reminded by a glance at his certificate. Expressions of derision and distrust of lawyers, however unfounded as to the great majority, are not to be given basis by exonerating those guilty of repeated violations of an obligation solemnly undertaken. We cannot condone gross carelessness of this kind practiced by respondent, and thus induce laymen to consult him with the confidence which a license by this court should inspire. We cannot permit this respondent to continue the practice of law, and thus invite the public to retain the purported services of one to whom the common obligations of his profession mean so little.

The conduct shown by this record makes it our duty to strike the name of respondent from the roll of attorneys. The report and recommendation of the commissioners are approved. Respondent's name is stricken from the roll of attorneys of this court.

*Respondent disbarred.*

DAVIS, J., HERSHEY, C.J., and SCHAEFER, J., specially concurring: While we agree with the result reached by the court, we dissent from the general implication that the proof in the case fails to show criminal or dishonest conduct. Under the Johnson, Hunter, and Hausman specifications, as set forth in counts II, III, and VI, we believe the proof clearly shows fraudulent motives, lack of honesty, and moral turpitude.