(No. 57985.—

*In re* EUGENE LEE ARMENTROUT *et al.*, Attorneys,
Respondents.

*Opinion filed December 16, 1983.*

MORAN, J., took no part.
SIMON, J., concurring in part and dissenting in part.

Mary M. Conrad, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Sidney Z. Karasik, of Chicago, for respondent Eugene Lee Armentrout.

Benedict Schwarz II, of Schwarz & Golden, Ltd., of West Dundee, for respondent Charles E. Petersen.

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for respondents Kim Edward Presbrey and William H. Weir.

Dennis A. Berkson, of Chicago, for respondent Jay Robert Grodner.

JUSTICE UNDERWOOD delivered the opinion of the court:

Pursuant to our rules establishing the Attorney Reg-

istration and Disciplinary Commission (73 Ill. 2d Rules 751 through 771), its Administrator filed a complaint against Eugene Lee Armentrout, Charles E. Petersen, Jay Robert Grodner, Kim Edward Presbrey, William H. Weir, and William John Truemper, Jr. At the time of the incidents alleged in the complaint, respondent Armentrout was Kane County's State's Attorney and respondents Petersen and Grodner were his assistants. Respondents Presbrey, Weir and Truemper were in private practice. The complaint alleged that each respondent had violated DRs 1—102(A)(4), (5) and (6) of the Illinois State Bar Association's 1970 Code of Professional Responsibility and was guilty of conduct tending to defeat the administration of justice and to bring the courts and legal profession into disrepute.

The Administrator charged Armentrout with overseeing a plan to forge signatures on petitions seeking a statewide advisory referendum on whether taxing and spending ceilings should be established for State and local governments. He was also charged with falsely notarizing the forged petitions. The Administrator charged Petersen with forging voter signatures and with actively recruiting Grodner, Presbrey, Weir, and Truemper to assist in this effort. The latter four respondents were so charged. Throughout the briefs and the record the respondents have referred to their acts of forgery as "roundtabling." They explain that this term connotes a group of people gathered at a table who circulate petitions to one another. Each person signs a name obtained from a phone book or voter registration list and then passes the petition on to the person sitting next to him, who does the same.

The hearing panel found that all respondents knowingly engaged in fraudulent activities contrary to justice, honesty and good morals and that the legal profession

was disparaged as a result. The panel recommended that respondent Armentrout be suspended for 18 months, that respondent Petersen be suspended for six months, and that the remaining respondents be reprimanded. Armentrout and Petersen filed exceptions to the recommendations, as did the Administrator, who urged disbarment for Armentrout, a two-year suspension for Petersen, and censure for the others. The Review Board concluded that the respondents' forgeries on the petitions undermined our democratic system of government and that their fraudulent activity brought the legal profession into disrepute. That board recommended disbarment for respondent Armentrout, an 18-month suspension for respondent Petersen, six-month suspensions for respondents Grodner, Presbrey and Weir, and censure for respondent Truemper. Respondents Armentrout, Petersen, Grodner, Presbrey, and Weir filed exceptions to the Review Board recommendations. Respondent Truemper did not except to the recommendation, and on April 20, 1983, this court severed Truemper from the instant action and censured him.

The evidence established that in 1978 the Governor had proposed that Illinois voters consider the following question in an advisory referendum: "Shall legislation be enacted and the Illinois Constitution be amended to impose ceilings on taxes and spending by the State of Illinois, units of local government, and school districts?" For the referendum to appear on the ballot, the State Board of Elections ruled that written petitions signed by 589,416 registered voters were required to be submitted by August 21, 1978. The Kane County State's Attorney's staff, at the direction of respondent Armentrout, participated in a statewide effort by those supporting the Governor to obtain the necessary signatures. At first, they collected voter signatures legitimately by can-

vassing Kane County fairgoers. This effort produced about 10,000 signatures, but was apparently deemed an inadequate showing of support from Kane County, because shortly after the county fair ended, the Governor telephoned respondent Armentrout at his home and personally requested that respondent collect at least 10,000 more voter signatures. Armentrout testified that he subsequently received approximately 20 telephone calls from several of the Governor's election campaign staff members and others, including a mailgram bearing the Governor's name, all emphasizing the political significance of the request. Armentrout testified that one campaign staffer suggested that the additional signatures could be collected by "roundtabling."

On August 15, 1978, shortly after receiving the telephone call from the Governor, respondent Armentrout solicited Petersen's help in complying with the Governor's request for additional signatures. Armentrout had been elected State's Attorney in 1976, was 39 years old, and had been in practice for 15 years at the time of the incidents in question. As State's Attorney, he had employed respondent Petersen as an assistant State's Attorney upon the latter's graduation from law school in 1977. Petersen was 27 years old and had been an assistant prosecutor for approximately one year when he became involved in the roundtabling scheme. These two respondents discussed roundtabling as the means necessary to obtain the requested 10,000 signatures by the August 21 deadline. They acknowledged to each other that roundtabling was illegal but rationalized that it would be acceptable in this instance because they would be forging signatures only to ensure that a purely advisory referendum would appear on the ballot.

At Armentrout's behest, Petersen contacted respondents Grodner, Presbrey and Weir and asked that they

meet him at Patrick's Pub in Aurora. Grodner had worked for Armentrout as a student intern during his last year of law school and, after graduating, was hired as an assistant State's Attorney. He had been licensed to practice for approximately three months and was 26 years of age when the roundtabling incidents occurred. Respondents Presbrey and Weir had been in private practice for approximately 14 months; the former was 27 years old and the latter 31 when they became involved. Respondents Grodner, Weir and Petersen had attended the same law school, and Presbrey and Petersen were long-time close friends.

Before this group met at Patrick's Pub, they handed petitions to passersby outside the shopping center where the pub was located. Upon retiring to the pub, Petersen told the others that Armentrout needed to obtain thousands more voter signatures and that roundtabling would be necessary to meet his quota. The group discussed the illegality of roundtabling, but Petersen repeated the rationale that Armentrout had previously offered to denigrate the significance of the forgeries. While eating and drinking beer at the pub, Petersen, Grodner, Presbrey, and Weir signed names to a petition that were clearly not those of Illinois voters, such as cartoon character names, in a light-hearted spirit.

The following day, August 16, the roundtabling project proceeded in a more serious vein. Respondent Petersen and Jeff O'Brien, an investigator from the State's Attorney's office, were in Aurora working on a case and stopped at respondent Presbrey's home. While watching television and drinking beer, Petersen and Presbrey, as well as Mrs. Presbrey and Jeff O'Brien, roundtabled approximately 10 petitions by signing names that appeared in the telephone book.

When Petersen submitted these petitions to Armen-

trout at the State's Attorney's office the next day, August 17, Armentrout chastised him for using the telephone book to roundtable. Armentrout advised against this because the petitions forged at the Presbrey home contained last names that all began with the same letter, which could arouse suspicion. Armentrout then obtained lists of registered voters for subsequent roundtabling.

Petersen arranged the next roundtabling session for Friday evening, August 18, in a law office where he engaged in a part-time private practice. He again recruited the help of respondents Grodner, Presbrey and Weir, as well as that of his roommate and another friend. Petersen also had pizza and beer delivered to the premises. Several other friends and relatives of various group members happened upon the scene and, influenced by the party atmosphere that had developed, lent their assistance. The group used the voter lists obtained by Armentrout to forge names on numerous petitions and spent approximately three hours doing so. Afterward, Petersen telephoned Armentrout to arrange to deliver this latest group of forged petitions, and they agreed to meet the following Saturday morning, August 19, at the Kane County courthouse. It was also agreed that, because they had not yet met their quota of 10,000 signatures, Petersen would ask those who were still at his office to meet Saturday morning at the courthouse for one final roundtabling session. Respondents Grodner and Weir, as well as some of the other participants, agreed to do so.

At the August 19 courthouse meeting, respondents Petersen, Grodner, Weir and several others forged signatures on approximately 60 petitions. On this occasion, Armentrout added the county name to many of the petitions and "corrected" some of the addresses shown for the forged signatures so that they would be acceptable

to the State Board of Elections. He also falsified the jurats on the petitions. Using his own notary stamp, but pressing very lightly so that his name would not appear on the page, he forged signatures as notaries, including that of a deceased friend. On Sunday, August 20, he submitted all of the petitions respondents had roundtabled to the Republican county chairman for eventual submission to the Board of Elections. The record does not reveal the total number of roundtabled petitions submitted.

In 1979, a special State's Attorney commenced a grand jury inquiry into the activities of the respondents. Respondent Weir was granted immunity from prosecution and testified before the grand jury. Respondent Grodner also testified under an immunity grant, but he later waived immunity when faced with possible perjury charges. Following the inquiry, the special prosecutor filed informations against Armentrout, Petersen, Grodner and Presbrey. Armentrout pleaded guilty to two violations of section 29—12 of the Election Code (Ill. Rev. Stat. 1977, ch. 46, par. 29—12) and was fined $2,000. Petersen also pleaded guilty to two violations of section 29—12 and was fined $1,500. Grodner and Presbrey each pleaded guilty to one violation of the same section, were placed on supervision for six months, and their records later expunged. Grodner paid a $1,000 fine; Presbrey was fined $100. Considerable publicity attended these criminal proceedings.

All respondents admit that they roundtabled and that they were aware of the illegality of their acts. Respondent Armentrout admits that he instigated the project, forged notary signatures, and otherwise tampered with the petitions. All respondents urge this court to reduce the recommended sanctions based on the mitigating evidence they submitted, which consisted in large part of testimony and affidavits of numerous judges, public offi-

cials, lawyers, and citizens regarding respondents' good character and fitness to practice law.

At the time of respondents' misconduct, the Illinois State Bar Association Board of Governors had adopted a code of professional responsibility. Included in the code were DRs 1—102(A)(4), (5), and (6). Those rules provided: "(A) A lawyer shall not: *** (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (5) Engage in conduct that is prejudicial to the administration of justice. (6) Engage in any other conduct that adversely reflects on his fitness to practice law." (Illinois Code of Professional Responsibility DR 1—102(A)(4), (5), (6) (Illinois State Bar Association 1970).) This court subsequently adopted verbatim DRs 1—102(A)(1) through (5) in our rules (79 Ill. 2d R. 1—102), but did not adopt DR 1—102(A)(6) (79 Ill. 2d R. 1—102, Committee Commentary).

There can be no doubt that respondents violated DR 1—102(A)(4). Acts of forgery most certainly involve "dishonesty, fraud, deceit, [and] misrepresentation" and are contrary to the bar's fundamental obligation of honesty. (*In re Lamberis* (1982), 93 Ill. 2d 222, 228.) Respondent Armentrout argues, however, that because no specific individual was victimized by his misconduct, no fraud occurred, an argument which is, in our judgment, devoid of merit. Fraud encompasses a broad range of human behavior, including " '*** anything calculated to deceive, *** whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture.' " (*Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 435, citing *People ex rel. Chicago Bar Association v. Gilmore* (1931), 345 Ill. 28, 46; *In re Alschuler* (1944), 388 Ill. 492, 503-04; Black's Law Dictionary 594 (5th ed. 1979).) Too, this court has previously disciplined lawyers even though their fraudulent misconduct did not harm

any particular individual. *In re Lamberis* (1982), 93 Ill. 2d 222, 229.

Armentrout also argues that his guilty plea to the criminal information should not be considered determinative of whether his conduct was fraudulent because, he states, one of the charges was void. However, the decision whether to impose discipline does not rest on whether a respondent has been convicted of criminal charges—it is determined by whether the lawyer's conduct contravenes professional standards. "The purpose of the criminal prosecution is not the purpose of a disciplinary proceeding. Punishment is not the object. The object of such an inquiry is to determine whether the attorney is a proper person to be permitted to practice his profession. [Citations.] The attorney is being disciplined not because of his conviction but because of the conduct. [Citation.]" (*In re Andros* (1976), 64 Ill. 2d 419, 423.) It cannot, in our judgment, be seriously contended that the conduct here does not come within the prohibitions of DR 1—102(A)(4) against "dishonesty, fraud, deceit, or misrepresentation." It is clear, too, that the inevitable effect of the widespread publicity regarding the respondents' misconduct and the ensuing criminal proceedings was to bring the legal profession into disrepute. While the immediate and major impact is upon those directly involved, the ripples, as with a stone cast into a pond, affect the whole.

One other aspect of the argument in this case requires comment. Speaking generally, the respondents, other than Armentrout and Petersen, have freely acknowledged the fraudulent and dishonest nature of their acts, characterizing them as "stupid," or stemming from perverted senses of loyalty to a supervisor or friendship, or both. They concede they have damaged the reputation of the legal profession and brought it

into disrepute. Respondent Armentrout, however, and, to a somewhat lesser extent, respondent Petersen, while admitting the dishonesty of their actions, urge that they involved "political" rather than "moral" turpitude and, consequently, did not diminish public confidence in the legal profession. This contention apparently stems from the premise that normally immoral and unlawful conduct somehow becomes less so when committed in a political context, and they classify the nonbinding tax-limitation referendum as "a political gimmick." They emphasize the absence of harm to any individual, and then make the remarkable suggestion that we should take judicial notice of what is asserted to be the widespread use of roundtabling. While some of these arguments may conceivably be considered in mitigation, they are totally irrelevant on the issue of guilt. We do not know whether roundtabling is frequently used or not, but we do know that it will not be discouraged by excusing those who engage in it. The forging of names on the petitions, whether represented as being voters or notaries, was illegal, dishonest and deceitful and known to be so by all of the respondents. It certainly became no less wrong because occurring in the context of a political campaign.

While there is no doubt that disciplinary action is required, the precise sanction to be imposed is not so easily resolved. The fundamental purpose of proceedings such as these, is, of course, "to maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public." (*In re LaPinska* (1978), 72 Ill. 2d 461, 473.) Predictability and fairness require that there be reasonable consistency in the sanctions imposed for similar types of conduct. (*In re Saladino* (1978), 71 Ill. 2d 263, 275; *In re Clayter* (1980), 78 Ill. 2d 276, 283; *In re Levin* (1979),

77 Ill. 2d 205, 211.) Fraudulent misconduct has customarily received a more severe sanction than censure. (*In re Nowak* (1976), 62 Ill. 2d 279, 283; *In re Sherre* (1977), 68 Ill. 2d 56, 62; *In re March* (1978), 71 Ill. 2d 382, 400.) There are, however, in this case varying levels of culpability, and application of the same sanction to all respondents would be completely inappropriate as the Administrator, Review Board, and hearing panel have all recognized. We have found no closely resembling case either in this State or elsewhere. The recommendations of the Administrator, which are of importance to us (*In re Hall* (1983), 95 Ill. 2d 371, 376), have remained constant at all stages of these proceedings: disbarment for Armentrout, two years' suspension for Petersen, and censure for the remaining respondents. We agree that censure is appropriate for all respondents other than Armentrout and Petersen. Weir and Presbrey were young lawyers with less than two years' experience at the bar. Neither made any special effort to involve his friends and relatives, nor did they organize any roundtabling sessions. They both apparently participated in their subordinate roles out of a misguided sense of loyalty and friendship and make no effort to justify their conduct. Both have experienced considerable humiliation, Presbrey having pleaded guilty and paid a fine as a result of his conduct. They undoubtedly were influenced by the fact that Petersen, an assistant State's Attorney, and Armentrout, the State's Attorney, approved the project. There appears little reason to be concerned about their future conduct in the profession. Respondent Grodner, the youngest of the three, was an assistant State's Attorney at the time of the episode but had been admitted to practice only three months. He, too, did not organize any roundtabling sessions or recruit others, and he played a minor role. While we re-

gard his participation while an assistant State's Attorney as an aggravating factor, his comparative inexperience, coupled with the fact that he pleaded guilty and paid a substantial fine, serves to in some degree mitigate his offense. Too, it seems apparent that his participation resulted from the request of his supervisors, and he, also, was undoubtedly influenced by their approval of the project. While that fact does not excuse his participation in an obviously improper activity, it is a substantial consideration.

Something more than censure, however, is required in the case of Petersen. While he, too, acted at the request of his supervisor, he was effectively second in command of the project. It was he who actively enlisted the assistance of his friends and his subordinate in the fraudulent activities, and he organized the roundtabling meetings. Too, he had served as an assistant State's Attorney since leaving law school in 1977. He was substantially more experienced and shared the responsibility of the office to a greater degree than Grodner. While less egregious than Armentrout's, his secondary leadership position in this unlawful scheme requires his suspension from the practice of law for a period of six months. Only his youth and his previously unblemished reputation dissuade us from a longer suspension.

Finally, we consider the circumstances regarding then State's Attorney Armentrout. He was a mature, experienced lawyer and the chief law-enforcement officer of Kane County. He was under no illusions as to the roundtabling procedure suggested to him, for he and the Governor's staff member had discussed the interspersion of the fraudulent petitions among the legitimate ones so as to make their detection less likely. He deliberately sought to conceal his participation in the roundtabling scheme by pressing his notary seal so lightly

that his name was not identifiable. It was at his instigation and on the basis of his rationalization that his subordinates and their friends undertook the roundtabling project and jeopardized their professional careers. While he was a precinct committeeman, loyal to his party and active in its affairs, it is difficult to understand how he could have considered the potential benefits to his political career from this project could possibly justify the unlawful methods used. For one who so lightly regards his own oath of office and fundamental concepts of honesty and integrity, as well as the effect of his actions upon the professional careers of others, we cannot fault the Administrator for recommending disbarment. We must, however, weigh these factors against those mitigating factors which may properly be considered. (*In re Howard* (1977), 69 Ill. 2d 343, 355.) They include the fact that Armentrout was convicted and fined for the misconduct. He did not seek reelection as State's Attorney, and what was a promising political career has apparently been terminated. He has, as the hearing panel found, suffered substantial financial and professional loss. To be weighed, also, are the opinions of the many judges, lawyers and citizens praising his professional and community service and who, although aware of the misconduct, affirm their belief that it represents an isolated mistake in judgment which will not be repeated. These factors, considered with respondent's previously unblemished record, persuade us that suspension for two years is the appropriate sanction.

> *Respondents Armentrout and Petersen*
> *suspended; respondents Grodner,*
> *Presbrey and Weir censured.*

JUSTICE MORAN took no part in the consideration or decision of this case.

JUSTICE SIMON, concurring in part and dissenting in part:

The majority acknowledges that the conduct of the respondents was flagrant, and since it involved acts of forgery, their conduct constituted dishonesty, fraud, deceit and misrepresentation. I concur in those observations. I dissent, however, because I do not believe the sanctions imposed were sufficient in view of the serious nature of the misconduct. Tampering by members of the bar with any aspect of our voting process deserves neither leniency nor indulgence.

The respondents' conduct was planned and designed to mislead the officials in charge of voting procedures. They knowingly submitted fictitious names with the purpose of having them accepted by election officials as valid signatures of registered voters. The issue here is not, as the respondents would have us believe, whether the tax referendum in connection with which the fictitious names were submitted was important. Neither is it whether any one was hurt by their mischief, as the respondents contend should be asked. Rather the issue is whether the respondents intended to and did subvert the voting process, and whether they intended to and did mislead election officials into believing that signatures the respondents knew were fictitious were genuine.

The Hearing Board found:

"The intent of the respondents was to defraud, and the action of Eugene Armentrout in affixing a notary seal in a manner which would conceal his own name is particularly reprehensible."

The Review Board evaluated the seriousness of the respondents' fraud and deceit as follows:

"Collectively and individually, the conduct of the Respondents undermine our democratic system of govern-

ment. In our society, each person has equal power in our government based on his willingness to take part in the franchise process. Securing petitions to place a proposition on the ballot is a fundamental part of our electoral process. When one person or a group of persons participates in that process in such a way that fraudulently dilutes the strength of all others, it undermines the democratic system.

The thousands of fraudulent signatures manufactured by the Respondents helped to endanger a free society and tends to encourage skepticism on unwarranted occasions. When some of the participants in the fraud are lawyers; one being the chief lawyer of the county, two being assistants to the chief lawyer of the county, it brings the profession of the practice of law into serious disrepute."

Our responsibility here is not only to impose an appropriate sanction on the respondents for their fraudulent and deceitful conduct, but also to vindicate the sanctity of the voting machinery and to declare that the bar will not tolerate any tampering with it. In my judgment, the sanctions imposed are not severe enough to accomplish these ends or, in view of the high offices at least Mr. Armentrout and Mr. Petersen occupied, to improve public confidence in the bar, which is a significant, though admittedly not the only, reason for disciplinary proceedings. In many instances attorneys have been disbarred or have received suspensions of three years or longer because of fraudulent conduct in converting clients' funds. (*In re Feldman* (1982), 89 Ill. 2d 7 (disbarment); *In re Smith* (1979), 75 Ill. 2d 134 (disbarment); *In re Stillo* (1977), 68 Ill. 2d 49 (disbarment); *In re Snitoff* (1972), 53 Ill. 2d 50 (disbarment); *In re Anglin* (1970), 46 Ill. 2d 261 (five-year suspension).) I do not understand why the fraudulent and deceitful conduct in which the respondents engaged here should be regarded as less serious or should be sanctioned any less se-

verely.

In fact, it seems to me that a higher standard of responsibility and respect for the law should be expected of lawyers who are public officials than of their less visible brethren at the bar. Should we who have been honored with public office not be expected to set an example for them and for the public generally? Should we not be held to a higher standard of scrutiny? And, if we fall short, should we not be expected to answer more fully for our shortcomings?

Based on these observations, I dissent because after spelling out at length the egregiousness of the respondents' conduct, I believe that the majority concludes by imposing sanctions which are woefully inadequate and which indicate that public officials are not required to conform to higher standards then others, perhaps not even to standards as high as those demanded of others. Rather than reassuring the public that erring public officials will be held fully accountable for their misconduct, I fear that the sanctions the court has applied here will create the contrary impression.

With respect to Mr. Armentrout, the court points out in mitigation that he was convicted and fined for his conduct. This is not a mitigating consideration, for frequently we disbar those who have been convicted of crime and sentenced to serve prison terms for their misdeeds. The majority points out that Mr. Armentrout's promising political career has been terminated, a factor which I would regard as irrelevant. The majority also places emphasis on the large number of favorable testimonials he received from judges and other officials concerning his character and accomplishments. I believe that the distinction Mr. Armentrout had achieved in his political career and his public life as a lawyer should be regarded, if anything, as an aggravating rather than a mitigating factor. Because of his

important public position, Mr. Armentrout enjoyed the acquaintance of the judges and other highly placed public officials who testified or submitted letters in his favor. These officials might not have known or been willing to lend their support to lawyers who were more anonymous or less highly placed than Mr. Armentrout. As I suggested above, based on his visibility and the trust society placed in him as the highest legal officer of Kane County, we were entitled to expect more from Mr. Armentrout than he gave us. Not only did he fail to protect the election machinery against subversion, he sabotaged it himself in a calculated manner.

The majority laments that Mr. Armentrout has suffered substantial financial and professional loss, but is that not what frequently happens to those who are caught up in the disciplinary web because of their misconduct?

Mr. Armentrout's offense was a serious one and the sanction imposed by the majority fails to recognize its gravity. As a State's Attorney he was supposed to enforce the law, but instead, he not only callously violated it and our professional canons, but recruited other law enforcement officers to assist him in that endeavor. In addition, he took steps to conceal the fraud by warning his assistant, Charles E. Petersen, against using a telephone book for the purpose of copying names because of the ease of detection of that form of roundtabling. He then suggested to Petersen that names be copied off voters' lists instead of from telephone books. I believe Mr. Armentrout should be disbarred.

So far as Mr. Petersen is concerned, he too must answer as a public official. In addition to that violation of his public trust, he acted as the organizer and manager of the roundtabling operation, arranging the times and places for the activity and soliciting others to engage in it. I believe that the Administrator's recommendation of a two-year

suspension is more appropriate to the gravity of Mr. Petersen's conduct than the six-month suspension the majority has decided upon or the 18-month suspension recommended by the Review Board.

With respect to Mr. Grodner, I disagree with the majority that the fact that he had been admitted to practice for only three months when the roundtabling took place should serve as a mitigating factor. It must be apparent to all who examine this situation that one does not require a legal education or admission to the bar to know that what the respondents were doing was improper. The majority points out also in mitigation that Grodner was complying with the request of his superiors, but I am under the impression that the defense that "I was only following orders" was discredited both at the Nuremberg and the Watergate trials. I do not think it is asking too much of licensed attorneys to exhibit the good judgment to say "No" when they are importuned to engage in dishonest pursuits. Instead, Grodner and his co-respondents appeared to treat the activity in which they engaged as a joke. Grodner, too, occupied public office, and even if only for a short time, it was long enough to know that as a prosecutor he was expected to uphold the law, not violate it. The sanction of censure recommended for him by the Administrator is inappropriate, for it overlooks the obligation he undertook when he assumed the prosecutor's office. I believe the Review Board's recommendation that he be suspended for six months was a proper disposition.

I am agreeable to the imposition of censure as the sanction for the other respondents, not because their offenses were not serious, but rather because this court has already imposed censure on John Truemper, Jr., whose participation appears to have been generally of the same nature as that of Kim Edward Presbrey and William H. Weir. None of them were public officials.