(No. 55040.—

*In re* FRED MANDELL, Petitioner.

*Opinion filed January 21, 1982.*

Charles J. O'Laughlin, of Jenner & Block, of Chicago, for petitioner.

Charles S. Morgan, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

JUSTICE WARD delivered the opinion of the court:

The petitioner, Fred Mandell, who was admitted to the bar of Illinois in 1952, was disbarred on consent on April 30, 1975. He subsequently filed a petition for reinstatement before the Attorney Registration and Disciplinary Commission of this court. After hearing, a panel of the Hearing Board of the Commission recommended to this court that the petition be denied. The Review Board of the Commission affirmed the recommendation.

The petitioner was found guilty in 1975, after a jury trial in the United States District Court for the Northern District of Illinois at Chicago, of knowingly using the United States mail and wire communications in interstate commerce to commit fraud, of transporting property

obtained by fraud in interstate commerce, and in aiding and abetting in these offenses. Upon conviction he was sentenced to three five-year terms, which were to run concurrently. He served 3½ years after his sentence had been reduced.

Enid Mandell, who at the time was the wife of the petitioner, and Ernest Fairchild also had been named as defendants in the indictment. Enid Mandell was convicted on all counts and given a two-year concurrent sentence on each count, with provision for parole under 18 U.S.C. section 4208(a)(2) (1976). Fairchild, who was not convicted on the transportation count, was sentenced to a term of one year and one day on each of his convictions, to run concurrently. The convictions were affirmed on appeal in the United States Court of Appeals for the Seventh Circuit. (*United States v. Mandell* (7th Cir. 1975), 525 F.2d 671.) That court adopted the district court's summary of the evidence presented to the jury as its own statement of facts:

"There was overwhelming credible testimony which showed that Fred Mandell, an attorney, importuned first his office associate, Harold Kriv, and then a gambling acquaintance, Ira Leon, to invest in personal injury judgments which Mandell represented he had obtained against the City of Chicago in behalf of certain of his clients. Evidently Mandell had actually obtained two nominal judgments of $1,000 against the City. He took certified copies of those judgments, altered them by dismantling the certification and substituting spurious pages showing that each judgment was in the amount of $120,000. These he flashed to Kriv, a distressingly eager victim, and regrettably, also a member of the bar, telling Kriv that he could enjoy half of the judgments for an investment of $75,000 in cash. Kriv's $75,000 was to have added

to it $15,000 from Mandell, which was to be distributed $40,000 each to the two clients who had been persuaded by Mandell to sell their 'judgments' for $40,000, and $10,000 to a state court judge who was to preside over the bilking of Mandell's clients.

According to Mandell, the $240,000 in judgments would be 'discounted' with a judgment broker in Waukegan, Illinois who would pay within a matter of days $211,000. This would be divided between Mandell and Kriv 50-50 after the repayment to Kriv of his $75,000 investment and another $12,500 which he had invested with Mandell in regard to certain personal injury cases in which Mandell had contingent fee contracts.

Kriv came up with his $75,000 with amazing alacrity. One of the ingredients of the scheme was the need for speed, cash and no writing. Kriv went from bank to bank cleaning out his accounts and one belonging to his wife and gave Mandell the $75,000 in $100 bills and that was the last he ever saw of it.

The scheme was hopeless. There were no judgments that could be turned into $211,000 and Mandell needed some explanation for the whereabouts of Kriv's money when Mandell couldn't produce. Either fortuitously or as a part of the scheme, an explanation presented itself when Kriv was shot in his office on a Saturday afternoon by a black man who came to the office posing as a prospective client. Kriv was hospitalized and underwent major surgery. His wife was then involved by Mandell, Mandell's wife, Enid, and Ernest Fairchild who told Mrs. Kriv that her husband had been shot by irate blacks whom he had been cheating; that a black gang was out to get

Kriv, Mrs. Kriv, their children, the Mandells and their children unless the $75,000 could be used to pay them off. She gave her consent ignorant of the transaction in which her husband had engaged with Mandell. Thereafter Kriv and his wife were pressured into contributing yet another $58,000 to the non-existent black gang, a portion of which was raised by a telephone call to Kriv's father in Iowa, and his mailing of a $15,000 check to Kriv in Chicago, hence the wire and mail involvements in the scheme, and that money was never seen again, after it was delivered to the two Mandells and Fairchild for payment to the black gang.

The Mandells represented to the Krivs that Enid had contributed $23,000 to the final payoff. This was another fiction. Following a disagreement some months later, Enid demanded repayment of her money threatening Kriv to send the same 'guy' to do it again, only this time 'he'll complete the job.'

Leon was the second victim. The scheme was the same although some of the techniques were a bit different. He was importuned to invest $65,000 in a similar quick discount of judgments against the City. Mandell used the same names of clients, same judgment amounts, only this time he involved an unknown person who played the role of a lawyer for the City who flashed at Leon phony checks in large amounts which were to be Leon's and Mandell's for ready cashing in a few days. So generous was the man from the City that he offered a second check with a face value of $300,000 to Mandell and Leon if they could come up with an additional $75,000. Mandell 'contributed' $17,000 and Leon parted with another $58,000. Leon has yet to see any of the total

$123,000 he invested.

When Leon became insistent, he was told by Mandell that Mandell had become involved in an argument with the City lawyer, had killed him, that the lawyer's body was in the trunk of a car driven by Fairchild, that Fairchild wanted $50,000 to dispose of the body in Colorado, and Mandell needed $50,000 to escape the country. At that point Leon suspected something was amiss. But he went through the motions of raising the money, timing it in such a way that the checks he obtained could not be converted to cash until the next business day (which was a Monday) and over the intervening weekend he contacted his lawyers who in turn contacted the Government who in turn arranged for the apprehension of Mandell, in whose possession was found the spurious checks and other incriminating documents.

Enid Mandell's role in the Leon fleecing was that of a courier and passer of messages between Leon and. her husband. Fairchild participated directly in the portion of the scheme that involved a dead body in Fairchild's trunk, etc.

Clearly, as the indictment alleged, Mandell devised a scheme to defraud Leon and Kriv and Enid Mandell and Ernest Fairchild embraced it and aided and abetted in its perpetration. The scheme was successful. The mails and interstate wire were used and some of the proceeds were transported in interstate commerce, all as alleged in the indictment." *United States v. Mandell* (7th Cir. 1975), 525 F.2d 671, 673-74.

The findings of the hearing panel of the Commission on the petition for reinstatement included findings that the petitioner had not made restitution and that he "was less than candid and forthright in present-

ing evidence as it related to misconduct, restitution and compliance with Supreme Court Rule 764."

Considering the shocking character of the crimes of which the petitioner stands convicted, it may be questioned whether he ever should be restored to good standing in the profession.

We need not, however, address this question in view of the action we take here on the recommendations of the hearing panel and the Review Board.

At the hearing, Mandell emphatically denied guilt of any offense against Harold Kriv or Jacob Kriv. His attorney stated in closing argument before the panel that "the whole Harold Kriv matter was an unbelievable, bizarre theory and it just simply did not happen." The petitioner did admit the substance of the scheme to defraud Ira Leon, testifying variously that he had wrongfully obtained either $56,000 or $68,000 from Leon. He, however, denied telling Leon about the "killing" of the attorney for the city of Chicago and denied that his wife had been involved in any way in criminal conduct.

Here, the petitioner argues that he has recognized the nature and seriousness of his conduct. As to Ira Leon, he says that he forthrightly explained to the Commission his efforts to make restitution and to comply with the client-notification procedures set out in Rule 764 (73 Ill. 2d R. 764), which apply upon an attorney's suspension or disbarment.

In his petition for reinstatement, Mandell stated that restitution had been made to Ira Leon. Later he said that this claim had been made through error. He subsequently moved to amend that portion of his petition to read: "Restitution has been made to Jacob Kriv in the amount of $15,000. Subsequent settlements of civil suits brought by Harold Kriv and Ira Leon have resulted in payment to them of $15,000 and $25,000 respectively." The petitioner said that the statement that payment had been

made to Harold Kriv was error and that in fact no restitution was made to him. It should be pointed out that the reference above to the "settlements of civil suits" concerns a settlement apparently made by Enid Mandell. No settlement has been made by the petitioner. Still later the petitioner filed an amended petition, which in part stated: "So-called restitution has been made to Jacob Kriv in the sum of $15,000 as set forth in the answer to question 8 as a condition of Enid Mandell's probation." (Question 8 on the petition form was an inquiry as to all financial obligations of a petitioner for reinstatement at the time of filing the petition.)

In answering Question 8, the petitioner declared these obligations:

Internal Revenue Service: $230,000. He noted that he had been paying the IRS $150 per month for the past two years.

Allen Mandell: $16,800. This debt was incurred in 1974 and 1975 during his trial and represented attorneys' fees and costs. The petitioner stated that he paid this indebtedness in full in 1978.

Birdie Kwate, his ex-mother-in-law: $5,800. He said that this was repaid in full in 1978.

Harold Kriv: The petition stated that Kriv had obtained judgments in the amount of $1,062,943. At the hearing, however, his counsel said that this entry was erroneous and that the judgment obtained by Kriv was in the amount of $102,000.

Ira Leon: A judgment for $123,000.

Cerwe Builders vs. Mandell: A judgment for $17,138.67 was obtained against the petitioner and Enid Mandell in November 1977.

Marshall Field & Company: A judgment in June 1977 for $48,896.29 against the petitioner and Enid Mandell.

(The petitioner testified that the debts involved in the Cerwe Builders and the Marshall Field & Co. judgments were incurred by Enid Mandell and that he had been sued on the ground that they represented family expenses.)

In the answer to Question 8, it was also stated: "Enid Mandell paid Jacob Kriv, father of Harold Kriv, $15,000 restitution on August 5, 1976. Restitution was made with funds provided by petitioner."

Our Rule 767 (73 Ill. 2d R. 767), in part, states factors to be considered by a hearing panel of the disciplinary commission upon the filing of a petition for reinstatement as attorney. The stated factors are:

> (a) the nature of the misconduct;
> (b) the maturity and experience of the petitioner at the time of discipline;
> (c) whether the petitioner recognizes the nature and seriousness of the misconduct;
> (d) when applicable, whether the petitioner has made restitution;
> (e) the petitioner's conduct since discipline;
> (f) the petitioner's candor and forthrightness in presenting evidence in support of the petition.

In addition the panel will consider other factors that it deems appropriate.

The following observations are relevant here: It is clear that a petitioner for reinstatement cannot seek to try again the issue of guilt after he has been convicted. Proof of conviction is conclusive of the attorney's guilt of the crime. (*In re Gold* (1979), 77 Ill. 2d 224, 226; 73 Ill. 2d R. 761.) A petitioner's continuing assertion of innocence of the offense, however, is of itself insufficient to bar reinstatement; the court must look further. (*In re Wigoda* (1979), 77 Ill. 2d 154, 161.) (The petitioner acknowledges his guilt of the crime against Leon but not against the Krivs.) A petitioner must establish his or her rehabilitation sufficient for reinstatement by clear and convincing

evidence. Findings made by a hearing panel of the disciplinary commission are " 'entitled to virtually the same weight as the findings of any initial trier of fact.' " *In re Wigoda* (1979), 77 Ill. 2d 154, 158, quoting *In re Hallett* (1974), 58 Ill. 2d 239, 250.

We do not consider that the recommendation here of the hearing panel and Review Board was inappropriate. The offenses of which the respondent was convicted were calculated and grave crimes. Admitted to the bar in 1952, he was a person of maturity and experience. His testimony relative to his claim that he had made restitution was not persuasive. The petitioner testified that he assumed the $25,000 paid to Leon by his wife was his money. The reasoning for the assumption was unconvincing. When Enid was divorced from her first husband, she realized $40,000 from the sale of their house. When she married the petitioner, a house was purchased and Enid put up the $40,000 as a down payment. The title to the house was in the name of Enid. The house was later sold when the Mandells were divorced and sold for a profit, it may be assumed. When the respondent was asked to explain the contention that he had "put money into the house" he testified: "I made improvements; construction, furniture. *** It was always my belief that the restitution was made with my money." The respondent was asked whether the judgment of Ira Leon against him for $123,000 included the $68,000 that he had wrongfully taken from Leon. He said that it did. He stated that he had never contacted Leon because during the pendency of the trial there was a charge that the petitioner had threatened Leon and that the court enjoined him from communicating with Leon. He said that he had been brought in court three times during the preceding year on Leon's motions for citations to discover assets. He testified that he had let Leon's attorney know that if Leon would like to get together with

the respondent, he would sit down and try to make arrangements for payment. He testified that he had not spoken to Leon or to Harold Kriv since the time of the trial. He stated that he did not owe Kriv anything. At another place in the hearing, however, he testified that he had obtained $12,500 from Harold Kriv. Kriv had given him the money when the petitioner, who was in need of funds, "sold" an interest in two personal injury cases to Kriv. Parenthetically, it appears from the record that it was stipulated that Harold Kriv had recently pleaded guilty to six counts of mail fraud. The petition for reinstatement stated that the restitution in the amount of $15,000 made by Enid Mandell to Jacob Kriv, the father of Harold Kriv, was made with funds provided by the petitioner; one may presume that the petitioner's reasoning that he had provided the $15,000 was the same as offered by the petitioner to support his statement that the $25,000 restitution to Leon made by Enid Mandell was made with funds provided by the petitioner.

Rule 764 directs that, within 21 days after disbarment or disbarment on consent, the attorney shall notify by registered or certified mail all clients with pending matters of the fact that he cannot continue to represent them. (73 Ill. 2d R. 764.) The rule further requires that, within 35 days after disbarment, the attorney shall file with the clerk of this court an affidavit stating that he has fully complied with the provisions of the rule. The rule states that it shall be the further responsibility of the attorney to keep and maintain records evidencing his compliance with the rule so that upon any subsequent proceeding proof of his compliance will be available.

The testimony of the petitioner with regard to Rule 764 was not persuasive. Admittedly he did not file the affidavit of compliance with the clerk of the court as the rule requires. To summarize the various relevant parts of

his testimony: He stated that his office was burglarized; that every file in the office and every index card was taken. He and a lawyer friend endeavored to reconstruct files so that the clients could be protected. His listing in the telephone directory as an attorney, he testified, was continued after his disbarment so that the clients would be able to communicate with his office or with his lawyer friend who was endeavoring to reconstruct the files. This was done without his knowledge, he said. The petitioner stated that he notified clients whose files were "reconstructed" that he was no longer in the practice of law. He said he notified some of these clients but that his lawyer friend did the bulk of the notifications because he had been sent to prison.

In the respondent's petition for reinstatement, however, in answering Question No. 16 pertaining to his compliance with Rule 764, the petitioner stated that he went to prison a day or two following his disbarment. He stated that his files were turned over to other attorneys and his clients were notified by registered mail within 21 days of his inability to continue to represent them. His testimony was that he had gone to prison on April 4, 1975, which was prior to his notification of disbarment. He was notified on April 30, 1975. Too, the suggestion that the petitioner was unable to comply with Rule 764 as he "went to prison a day or two following his disbarment" contradicted his own statement that he was incarcerated on April 4, 1975, and remained incarcerated only until April 21. Then his bond was reinstated and he returned to his home in Highland Park and resided there approximately 156 days. This, it would certainly appear, would have given ample time for him to comply with the provisions of Rule 764. In the petition for reinstatement no mention was made by the petitioner of the burglary of his office and the loss of his files.

This court observed in *In re Cohen* (1981), 83 Ill. 2d 521, that while the court has the ultimate responsibility to impose and enforce attorney discipline, the findings and recommendations of the Hearing Board and Review Board are entitled to and do receive the court's serious consideration. It was noted that the panel of the Hearing Board sees and hears the witnesses and plays an important role in hearing cases and in making factual findings in contested matters. The court said that the Hearing Board had an opportunity to appraise the petitioner's candor and sincerity. The observations made by the court there have application here. We consider that the conclusion of the Hearing Board panel that the petitioner had not made restitution and was less than candid and forthright in presenting evidence as it related to misconduct, restitution and compliance with Supreme Court Rule 764 was proper. The petitioner has not discussed the question of restitution with Leon, much less made arrangements with him to make or attempt to make restitution of the fraudulently obtained monies. He denies that he is indebted to Harold Kriv but acknowledges that he received $12,500 from Kriv for "an equity interest" in two personal injury cases he was handling. We have detailed above the unsatisfactory answers he gave as to whether he had made restitution. It is not inappropriate to note that in 1976 and 1977, while in prison, the petitioner received a total of $65,000 in accrued attorney's fees. There was no verification of his broad statement that most of the money was spent for legal fees and support for his ex-wife. The hearing panel had an opportunity to appraise the petitioner's candor and sincerity.

This court has stated: "Rehabilitation, the most important consideration in reinstatement proceedings, is a matter of one's 'return' to a beneficial, constructive and trustworthy role." (*In re Wigoda* (1979), 77 Ill. 2d 154, 159.) We agree with the Hearing Board and Review Board

that the petitioner has not sufficiently made his case through clear and convincing evidence. Accordingly, his petition for reinstatement to the roll of attorneys admitted to practice law in this State is denied.

*Petition denied.*