JOHN HUSTON *et al.* Appellants, *vs.* LOUIS M. NEWGASS *et al.* Appellees.

*Opinion filed April 23, 1908—Rehearing denied June 3, 1908.*

1. PARTNERSHIP—*the members of trading partnership may sign firm name to negotiable paper.* Members of a trading partnership have the right to sign the firm name to obligations or negotiable paper within the legitimate scope of the partnership business.

2. SAME—*third persons may deal with partnership until they have notice of dissolution.* Each partner of a trading firm may bind the other in dealing with third persons within the scope of the partnership business, and third persons will be protected in such dealings until they have notice of a dissolution of the partnership.

3. SAME—*secret withdrawal of one partner does not affect the rights of third parties.* The fact that one member of a trading partnership notifies the other partner of his withdrawal from the firm does not relieve him from liability to third persons who continue to deal with the other partner without notice of the change, in matters within the scope of the partnership business.

4. BILLS AND NOTES—*acceptor of draft is primarily liable thereon.* The acceptor of a bill of exchange becomes primarily liable for its payment and is to be considered the principal debtor, even though the acceptance is for the accommodation of the drawer, the acceptor having no funds of the drawer in his hands.

5. SAME—*when a bank is justified in honoring draft.* A bank which has been authorized by a commission firm to honor drafts of a stock-buying partnership until further notice, is justified in honoring a draft drawn in the usual course of business by the same partner who had drawn the previous drafts, even though, without notice to the bank, the other partner had withdrawn from the partnership with the knowledge of the commission firm, which neglected to notify the bank that its acceptance was withdrawn.

6. SAME—*when fact that draft was too large does not defeat recovery.* The fact that a draft honored by a bank was by mistake drawn for too large an amount does not defeat a recovery for the correct amount, where the declaration alleges that the amount of the excess has been credited on the draft by the bank, and where the defendants' refusal to pay is not based upon that ground but upon a denial of total liability.

DUNN, J., dissenting.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

This is an appeal from a judgment of the Appellate Court affirming a judgment of the superior court of Cook county. The action was assumpsit, brought by appellants, against appellees, to recover an amount claimed to be due on a draft drawn by Grindell & Dainty (also referred to as Dainty & Grindell) on appellees, upon which draft the cash was advanced to the drawers by appellants. We adopt, in part, the statement of the Appellate Court:

"Plaintiffs were in 1904 bankers at Blandinsville, Illinois, and defendants then were engaged in selling horses on commission at the Union Stock Yards, Chicago. In March of that year Isaac Grindell went to Blandinsville and engaged in the business of buying horses in that vicinity and shipping them to the Union Stock Yards to be sold. He opened an account in his own name with plaintiffs. April 1 he applied to plaintiffs to discount his draft for $2500 on defendants. In answer to a telegram from plaintiffs, defendants telegraphed them as follows: 'We will pay draft Isaac Grindell $2500 for horses shipped to us.' Grindell drew a draft for that sum April 5, 1904, to the order of plaintiffs, which was discounted by them and paid by defendants. About this time John Dainty became a partner of Grindell. Grindell soon after April 5 informed plaintiffs that Dainty had gone into business with him, and plaintiffs wrote in Grindell's pass-book, over his name, the words 'Grindell & Dainty.' A few days before April 15 plaintiffs wrote defendants that they wished a letter stating absolutely that they would honor all drafts drawn by Grindell & Dainty, and in answer, under date of April 15, defendants wrote plaintiffs as follows: 'We will honor drafts drawn by Dainty & Grindell, drawn on us for horses, until fur-

ther notice.' Grindell, for his firm, bought several car-loads of horses in April, May and June in the vicinity of Blandinsville and shipped them to defendants to be sold. Before paying for each lot of horses so bought, he drew, in the name of the firm, a draft on defendants to plaintiffs' order, which the plaintiffs discounted, placed the proceeds to the credit of said firm and paid the same out on checks drawn by Grindell in his own name. The course of business between Grindell & Dainty and the defendants was for Grindell to go into the country, buy horses, pay a small amount down on each horse, fix a date for the delivery of the horses at Blandinsville and payment of the remainder of the purchase price. Before going out he would sign a draft in the name of his firm on defendants, payable to the order of plaintiffs, with the date and amount left blank. When he had bought a car-load of horses he would direct plaintiffs to fill out a draft for a certain amount, and they would then fill out the draft and send it forward for collection. All the drafts so drawn previous to July were paid by the defendants."

Prior to July 1, 1904, nine shipments were made by Dainty & Grindell, for which drafts were drawn on appellees. The cash on all these drafts was advanced Grindell & Dainty by appellants, who forwarded the drafts for collection to their correspondent in Chicago and they were paid by appellees. The shipment out of which this controversy arises was made about July 20, 1904, and on July 21 a draft on appellees for $3300 was drawn. That amount of money was placed to the credit of Grindell & Dainty by appellants, to be checked against for the payment of the horses, and the draft was forwarded in the usual course of business for payment by appellees. By a mistake the draft was made for $1000 more than it should have been. One of appellants testified that Grindell telephoned the amount the draft was to be drawn for, and on account of his not speaking plainly or some confusion on the wires they un-

derstood him to say $3300. The correct amount was $2300. The draft was not presented to appellees until the day after the horses arrived and after they had been sold. They refused payment and the draft went to protest. Upon learning the draft had been made $1000 too large, and that amount of money remaining in the bank to the credit of Grindell & Dainty, appellants charged their account with that amount and credited it upon the draft and brought this suit to recover the balance. The cause was tried before the court without a jury and resulted in a judgment for appellees, which judgment has been affirmed by the Appellate Court, and a further appeal prosecuted to this court.

WENDELL HUSTON, and M. HENRY GUERIN, for appellants.

NEWMAN, NORTHRUP, LEVINSON & BECKER, HARRY GOODMAN, and CHESTER E. CLEVELAND, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

The defense interposed by appellees was, that they would accept and pay drafts drawn on them by Grindell & Dainty for horses shipped, but that the draft sued on was not drawn by Grindell & Dainty, as said firm had been dissolved before said draft was drawn. The buying and shipping was attended to chiefly by Grindell. Dainty resided in Chicago and officed with appellees. He testified that about the latter part of June he wrote Grindell not to buy any more horses on his or on his and Grindell's account, and that thereafter he had nothing further to do with Grindell in buying and shipping horses. He kept no copy of the letter and received no acknowledgment of its receipt from Grindell. He did not say whether he informed appellees of the dissolution of the partnership or not. One of the appellees, Max J. Newgass, testified that at the time the horses arrived in Chicago he knew the firm of Grindell & Dainty had

been dissolved but does not state from whom or when he received the information. No notice was given appellants of the dissolution by either Dainty or appellees, and it is not claimed that they had any knowledge of such dissolution. According to the evidence it must have been after June 27 that Dainty wrote the letter dissolving the partnership, if it was dissolved. Grindell continued the same business in the same manner and under the same firm name as he had previously been doing and appellants were in utter ignorance of any change in the firm.

Appellees claimed they knew, at the time the last shipment of horses was made, the firm of Grindell & Dainty had been dissolved. How long they had known it before that time was not stated. They offered in evidence a letter from Grindell dated July 20 and addressed to "Mr. Newgass." The letter stated the writer had shipped fourteen head of horses, and requested that when sold the profits be sent to him, "as Dainty told me he didn't want any more to do with shipping horses." This letter, according to the testimony, was received by appellees about two hours after the horses had arrived, so that if they knew of the dissolution at the time the horses arrived they did not get their information from this letter, and it is not probable they received such information from Grindell at any previous time, for he was doing business in the firm name the same as if there had never been a dissolution. The only persons testifying who did know of the dissolution were Dainty and appellees.

Appellants asked the court to hold as propositions of law that each partner in a commercial partnership has power to bind the other partner in dealing with third persons within the scope of the partnership until notice given of the dissolution of the partnership, and that a notice of dissolution given by one partner to the other has no effect upon the rights of third persons dealing with the partnership without notice of the dissolution; also, that notice of dis-

234—19

solution given by Dainty to Grindell was inoperative as to all persons with whom the firm of Grindell & Dainty had been doing business prior to the dissolution, unless those persons had knowledge of the dissolution. These propositions were refused, and in this we think the court erred. Here the firm of Grindell & Dainty was a trading partnership, and either of the partners had the right to sign the firm name to obligations or negotiable paper within the legitimate scope of the partnership business. It would hardly be denied that if Grindell had signed the firm name to a promissory note payable to appellants at the time he signed it to the draft, the firm would have been liable in an action to recover on the note. Under the circumstances disclosed by the evidence in this case, appellants were warranted in dealing with Grindell as a member and representative of the firm. Appellees had some acquaintance with Grindell but were unwilling to extend their credit to him alone. They were well acquainted with Dainty and sustained close relations with him, and their agreement to accept and pay drafts drawn by Grindell & Dainty was on account of their knowledge of and faith in Dainty. This, together with the profits they expected to derive from commissions on the sales of horses shipped them by Grindell & Dainty, induced them to agree with the appellants to pay their drafts. But for this agreement of appellees, appellants would not have furnished the money to Grindell & Dainty to pay for the horses. Appellees' agreement was to honor the drafts drawn on them by Grindell & Dainty for horses until further notice. It would seem consonant with both reason and justice that so long as appellants were justified in advancing the money to pay for horses on drafts drawn in the name of the partnership, appellees would be liable for the payment of the drafts until they had given notice to the contrary or appellants had received notice of the dissolution of the firm. It was certainly their duty, when they received knowledge of the dissolution of the firm of Grindell & Dainty, to have protected

themselves as well as appellants by notifying appellants of the fact and that they withdrew their agreement to honor further drafts if any such were drawn. Appellees' failure to so notify appellants was inexcusable negligence under the facts in this case. The quiet withdrawal of Dainty from the firm without notice to appellants would, we think, no more relieve appellees from liability than it would have relieved Dainty if the action had been brought against the partnership, and as we have before stated, under the facts proven a recovery might have been had against the firm of Grindell & Dainty.

The acceptor of a bill of exchange becomes primarily liable for its payment and is to be considered the principal debtor; and this is true even if the acceptance was for the accommodation of the drawer, the acceptor having no funds of the drawer in his hands to pay it. (*Cronise* v. *Kellogg,* 20 Ill. 11; *Diversy* v. *Moor,* 22 id. 331.) In *Hall* v. *First Nat. Bank of Emporia,* 133 Ill. 234, Hall Bros. were commission men in the Union Stock Yards. In response to a request from Greer & Way they telegraphed the First National Bank of Emporia they would honor Greer & Way's draft for cost of cattle and hogs consigned to them. It was held Hall Bros.' agreement to accept the draft before it was drawn made their liability the same that it would have been had they accepted it upon presentation, and that they took the risk of the stock being diverted, either by accident or design, while in transit.

It is insisted that in any event appellees were justified in refusing to honor the draft because it was drawn for $1000 more than was required to pay for the horses shipped, and on that account there can be no recovery. The suit is brought to recover only the $2300, and one of the counts of the declaration contains averments of the credit of $1000 upon the draft as originally drawn. It does not appear from the evidence that appellees based their refusal to honor the draft on the ground that it was drawn for

$3300 instead of $2300, nor have they at any time signified a willingness to pay $2300. On the contrary, they have from the first denied any liability whatever and have based their denial on the ground that the partnership between Grindell and Dainty had been dissolved before the draft was drawn, and that it was the draft of Grindell, and not of Grindell & Dainty.

We think the propositions of law refused by the trial court stated correct principles of law applicable to the decision of this case and should have been held by the court, and that the Appellate Court erred in affirming the judgment of the trial court. Accordingly, the judgments of the Appellate and superior courts are reversed and the cause remanded to the superior court.

*Reversed and remanded.*

Mr. JUSTICE DUNN, dissenting:

Since all questions of fact must be regarded as settled against appellants by the Appellate Court's affirmance of the judgment of the circuit court, it must be regarded as conclusively determined that the partnership of Dainty & Grindell was dissolved before the draft in question was drawn, and that Grindell had no authority to draw it in the firm name. Therefore it was, in fact, not the draft of Dainty & Grindell. The appellees had a right to stand upon their contract. If its terms bound them, they were bound; otherwise they were not bound. The only count in the declaration on which a recovery could be claimed was the first, which alleged that Dainty & Grindell drew a draft on appellees for $3300, which appellants cashed and which appellees refused to pay. The contract which is claimed to make appellees liable for the payment of the draft is set out in the count, and is a letter addressed to appellants, signed by appellees, and consisting of a single sentence: "We will honor drafts drawn by Dainty & Grindell, drawn on us for horses, until further notice." By the terms of the

letter appellees were bound to pay only drafts drawn by Dainty & Grindell, and only such drafts drawn by them as were drawn for horses. Appellants, in discounting the drafts, were bound to ascertain, at their peril, that such drafts were within the terms of the letter. They were bound to know, not only that the drafts were drawn for horses, but that they were drawn by Dainty & Grindell. In fact, the draft in controversy was not drawn by Dainty & Grindell. The fact that the appellants were deceived into thinking it was so drawn, and that both Dainty and Grindell may be liable to them for the dishonor of the draft, does not authorize holding appellees to a contract into which they have not entered.

Many authorities are cited by appellants' counsel to the proposition that upon the dissolution of a partnership the power of each partner to bind the others continues as to persons who have had dealings with the partnership until they have received actual notice of the dissolution. This is undoubtedly true, but is not applicable here because the question is not whether the signature, "Dainty & Grindell," made by Grindell without authority, binds Dainty, but whether it binds appellees. The latter agreed to pay drafts actually drawn by Dainty & Grindell,—not drafts which appellants might have good reason to believe were drawn by Dainty & Grindell. Even if appellees had notice of the dissolution of the firm they were under no obligation to notify appellants. (*Byers & Co.* v. *Hickman & Co.* 112 Iowa, 451; *Burch* v. *DeRivera,* 53 Hun, 367.) They had stated the terms upon which they would honor drafts, and unless those precise terms were complied with by the production of a draft drawn by the designated parties, they could not be held liable upon their specific agreement. *First Nat. Bank of Lacon* v. *Bensley,* 2 Fed. Rep. 609.

Moreover, this action is brought upon a draft for $3300, which it is alleged appellees agreed to accept. There is no basis for a recovery upon a *quantum meruit* or *quantum*

*valebat.* The appellees either agreed to accept this particular draft or they did not. There is evidence tending to prove, and it must be presumed that the court found, that Grindell bought the horses for $2300 but that the draft was drawn for $3300. This was probably a mistake; but can it be said that appellees' agreement to honor drafts drawn for horses required them to honor this draft for $3300 not drawn for horses? They stated in their letter the precise terms on which they would honor drafts. A compliance with those terms was essential, and appellants, in discounting the draft, took upon themselves the risk of being within those terms. (*Burke* v. *Utah Nat. Bank,* 47 Neb. 247.) Appellees' agreement was to honor drafts. If appellants recover, it must be upon a draft. They have declared upon a draft for $3300. There is no evidence tending to prove authority to draw such a draft or obligation on the part of appellees to honor it. In my opinion the judgment should be affirmed.