(No. 55798.—

*In re* JOEL SHANE CHERNOFF, Attorney, Respondent.

*Opinion filed June 18, 1982.*

UNDERWOOD and MORAN, JJ., dissenting.

David Beckerman, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

George B. Collins, of Collins & Amos, of Chicago, for respondent.

JUSTICE GOLDENHERSH delivered the opinion of the court:

On July 7, 1980, the Administrator of the Attorney Registration and Disciplinary Commission filed a complaint against respondent, Joel Shane Chernoff, who was licensed to practice law in Illinois on April 21, 1970. A panel of the Hearing Board recommended that respondent be suspended from the practice of law for a period of three months. The Administrator filed exceptions to the recommendation of the Hearing Board, and the Review Board recommended that respondent be suspended for one year.

The testimony shows that on September 13, 1978, Robert and Linda Wolff entered into a contract to buy a house in Wonder Lake and paid $1,400 as earnest money. The contract provided that the price was $38,000 and was contingent upon the Wolffs obtaining an FHA loan in the amount of $36,600. On approximately October 30, 1978, the Wolffs decided that they did not want to buy the Wonder Lake property because it was too far from their places of employment. On the recommendation of a friend the Wolffs sought advice from respondent on how to terminate the contract and obtain a refund of the earnest money.

The testimony concerning their first conference with respondent is conflicting. The Wolffs testified that respondent told them that if they filed for a divorce, FHA would not approve their loan application and their earnest money would be returned to them. Linda Wolff testified that she thought this was odd, since they had been married only three months. Respondent assured them that the "divorce" proceedings would not "leave the office" except to make FHA believe they were getting a divorce. Respondent testified that the Wolffs had come to him concerning the real estate contract because it was causing them a great deal of marital disharmony. Respondent said that Linda Wolff initiated the conversation concerning divorce, and that he only

confirmed the fact that filing for divorce would cause the FHA to disapprove granting a loan to the Wolffs.

The Wolffs agreed to initiate divorce proceedings. Linda Wolff entered into a retainer agreement with respondent and, at respondent's request, signed an affidavit that the allegations in the not-yet-prepared petition for dissolution of marriage were true. It is alleged in the petition for dissolution, *inter alia*, that Robert Wolff was "guilty of mental cruelty"; that Linda Wolff believed that she and her child feared for their well-being because of Robert's previous threats towards them; that she therefore prayed for a temporary injunction restraining Robert from harming Linda or her child and from dissipating marital property; that Robert had advised Linda that he would not make support payments even if a court ordered him to do so. Respondent admitted at the hearing that he had no reason to believe that Robert had made any threats against Linda or her child. Respondent asked Robert to sign a *pro se* appearance form to avoid the inconvenience of having him served by the sheriff. Respondent filed the petition and the *pro se* appearance in the circuit court of Cook County. Respondent notified the Great Lakes Mortgage Corporation, to whom the Wolffs had applied for the FHA loan, of the pending dissolution.

Contrary to respondent's expectations, despite notice of the dissolution proceedings, the FHA loan was approved. Robert Wolff then notified respondent that he was no longer receiving overtime compensation and that his wife had quit her job. The information concerning overtime pay was false. Respondent notified the realtors representing the sellers and Great Lakes Mortgage Corporation of the alleged change in circumstances of the Wolffs. There is nothing in the record to indicate that respondent was aware that this information was false. Great Lakes apparently checked the information and found that the informa-

tion concerning Robert Wolff was incorrect.

Respondent told the Wolffs that unless they could find another purchaser for the property they would lose their down payment. The Wolffs were unable to find a purchaser. Respondent told the Wolffs that he had a friend who invested in real estate and might be interested in purchasing the property. He also told them that the property would be purchased through a trust since Mr. Osberg, the purchaser, had recently been divorced and did not want his ex-wife to know that he owned additional property. Actually, respondent and Osberg were each to own a 50% beneficial interest in the trust. The Wolffs were not told that respondent was to have an interest in the property, were not advised to seek the advice of another attorney, and were not informed of the potential conflict of interest between respondent's interests and the Wolffs' interests. One of the documents signed by the Wolffs showed that respondent was to have a 50% interest in the land trust; however, the Wolffs testified that they were unaware that respondent was to have an interest in the property and believed that respondent was acting as Osberg's attorney with respect to the real estate transaction. The Wolffs also testified that respondent told them that they would be able to enter into another real estate contract and obtain FHA financing "as soon as the paper work was cleared up." The Wolffs testified that they were never informed that the purchaser was merely assuming the mortgage and that they were still liable on the mortgage.

Respondent eventually bought out Osberg's interest in the trust for $500. The property was rented, but unexpected problems were encountered in obtaining tenants, and at times payments on the mortgage were not made for periods as long as six months.

The Wolffs entered into an agreement to purchase another house and made an earnest money payment in the

amount of $2,000. They then learned that they could not obtain an FHA-insured mortgage because they were liable for the mortgage on the Wonder Lake property. They complained to respondent who agreed to obtain a release for them. FHA, when it discovered that the property was held as investment property and was not occupied as the owner's residence, demanded an additional 5% principal payment. Respondent refused to pay the additional 5%. The Wolffs testified that they lost their $2,000 earnest money because while they were attempting to get a release from respondent on the Wonder Lake property mortgage their realtor was declared bankrupt.

State Farm Insurance Company had issued a home owners' policy covering the Wonder Lake property. After the closing of the real estate transaction with the original owners, respondent called to cancel the policy. Since the State Farm office was next door to respondent's office, State Farm gave respondent the refund check. The check was made payable to Linda and Robert Wolff. Respondent signed Robert and Linda's names to the back of the check and deposited the check in his business account. Respondent did not notify the Wolffs that he had received the check or that he had signed their names on the back of the check. When the Wolffs discovered that a check had been issued to them and was purportedly endorsed by them, they went to respondent to find out what had happened. Respondent told them that he was entitled to the refund, and refused to pay them anything. Respondent testified that he believed he was entitled to the money, but admitted to the Hearing Board that it was "a mistake" to sign the Wolffs' names on the back of the check. It is not clear from the testimony who had paid the premium or whether respondent was entitled to the refund.

Respondent testified that he had taken a course in professional responsibility in his third year of law school. He

stated that he was unaware that it was unethical to do business with a client; he thought that the only restriction when transacting business with a client was that the transaction had to be at arm's length.

The Hearing Board found that the Wolffs, when they first came to respondent's office, did not intend to get a divorce; that respondent was aware of this and "had no intention to pursue the divorce proceeding except as a ruse to prevent FHA approval of their application." Concerning the real estate transaction, the Hearing Board concluded that the inference to be drawn from respondent's telling the Wolffs that they would be able to get a mortgage approximately six weeks after the transaction was closed was that the Wolffs would no longer be responsible on the mortgage. The Board also concluded that respondent did not disclose his interest in the real estate transaction, that he failed to inform them that they should seek the advice of another attorney, and that the Wolffs believed that Osberg was the sole purchaser of the property. The first time that the Wolffs became aware that they were still liable on the Wonder Lake property mortgage was after they made a $2,000 down payment on another house and were told that they could not, for that reason, obtain FHA-insured financing. The Hearing Board concluded that the Wolffs were not released from liability on the Wonder Lake mortgage because an additional 5% down payment was required which respondent refused to pay. Although the record does not show in what manner it was effected, the Hearing Board found that in December 1980 the Wolffs were released from further liability on the mortgage. Concerning respondent's signing the Wolffs' names to the back of the insurance premium refund check, the Board found that respondent's "mistake" was not the result of a good-faith misunderstanding on his part.

The Review Board affirmed the findings and the con-

clusions of the Hearing Board but recommended suspension for one year.

Respondent argues that the dissolution proceedings were not "wrongful" and should not be the basis of discipline, and that he did not act dishonestly in the real estate transaction. Conceding that he should not have endorsed the Wolffs' names on the insurance check, he argues that there was no conversion of clients' funds. The testimony concerning these matters was conflicting. The resolution of conflicting testimony is best resolved by the hearing panel, since it had the advantage of observing the witnesses. (*In re Hopper* (1981), 85 Ill. 2d 318, 323; *In re Wigoda* (1979), 77 Ill. 2d 154, 158-59.) As the trier of fact, the Hearing Board's findings are entitled to substantially the same weight as any initial trier of fact. (*In re Feldman* (1982), 89 Ill. 2d 7, 10; *In re Mandell* (1982), 89 Ill. 2d 14, 23.) After reviewing the record, we find substantial support in the record for each of the Hearing Board's findings.

It is the Administrator's position that in advising the Wolffs to file "a fraudulent divorce" and in filing a petition for dissolution and affidavit containing statements which he knew to be false, respondent perpetrated a fraud on the court. It does not appear that any order or judgment was sought on the basis of the pleadings, and we do not, therefore, reach the questions whether the filing of the pleadings constituted a fraud on the court or was designed, as charged by the Administrator, to defraud the FHA. The filing of the petition for the sole purpose of effecting disapproval of the application for the FHA loan was conduct prejudicial to the administration of justice proscribed by Rule 1—102(a)(5). 79 Ill. 2d R. 1—102(a)(5).

Accepting as we must, the finding of the Hearing Board that respondent entered into a business transaction with his clients without making a full disclosure of his interest and without advising that they seek the opinion of

other counsel, it is clear that respondent violated Rule 5—104(a) of the Code of Professional Responsibility, which provides:

"(a) A lawyer shall not enter into a business transaction with a client if they have conflicting interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." 79 Ill. 2d R. 5—104(a).

Concerning the matter of the insurance refund, although the record does not support the Administrator's contention that there was a conversion of his clients' funds, there is no question that respondent, without authorization, endorsed the check by which the refund was effected. Even assuming that he was entitled to the money and that the clients had no further interest in it, this type of conduct is unprofessional and cannot be condoned.

The decision of what sanction is appropriate in a disciplinary matter, admittedly difficult, rests with this court. (*In re Hopper* (1981), 85 Ill. 2d 318, 323; *In re Sherman* (1975), 60 Ill. 2d 590, 593.) While each case is unique, to the extent possible sanctions should be imposed consistent with those in cases with similar factual situations.

From our review of the record we are not persuaded that respondent's conduct in filing the petition for dissolution was motivated by fraud and deceit. As we said in *In re Schuyler* (1982), 91 Ill. 2d 6, 18, "There is no clear and convincing evidence that the respondent's conduct was the result of anything more than exceedingly poor judgment."

Concerning the matter of the respondent entering into the transaction with the Wolffs which culminated in his acquiring a one-half beneficial interest in the trust, there is no question that one of the documents signed by the Wolffs reveals respondent's interest. Despite the violation of the disciplinary rule it does not appear that respondent defrauded or overreached his clients. In view of the small

amount of money involved, consultation with other counsel would appear to have been impractical, but nevertheless, respondent's conduct falls far short of the degree of disclosure required in a transaction between an attorney and his client.

With respect to the matter of the endorsement of the check for the insurance refund, there is no question that endorsement of drafts without authority is improper. (*In re Dombrowski* (1978), 71 Ill. 2d 445, 450.) We note, however, that there appears to have been a *bona fide* dispute as to whether respondent or the Wolffs were entitled to the return of the money, and the Hearing Board made no finding of conversion of funds.

The Review Board agreed with the Hearing Board with respect to the findings of fact and disagreed only as to the appropriate sanction. To a great extent the appropriate sanction to be imposed must depend upon the venality of the misconduct. Upon review of the record and the recommendations of the Hearing and Review Boards we conclude that suspension for a period of six months would be an appropriate sanction. Respondent is, accordingly, suspended for a period of six months.

*Respondent suspended.*

JUSTICE UNDERWOOD, dissenting:
In my judgment nothing short of the one-year suspension recommended by the Review Board is appropriate to the misconduct of which respondent was guilty.

JUSTICE MORAN joins in this dissent.