(No. 67740.

*In re* PAUL SVEINBJORN JOHNSON, Attorney,
Respondent.

*Opinion filed December 21, 1989.—Rehearing
denied April 9, 1990.*

MILLER, J., concurring in part and dissenting in part.

Thomas P. Sukowicz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Michael L. Bolos, Ltd., of Shorewood (Michael L. Bolos, Jr., of counsel), for respondent.

JUSTICE RYAN delivered the opinion of the court:

On January 14, 1987, the Administrator of the Attorney Registration and Disciplinary Commission (Administrator) filed a three-count complaint charging the respondent, Paul Sveinbjorn Johnson, with numerous acts of professional misconduct arising out of the settlement of a claim of his client, Walter Geldzahler, against INA Life Insurance Company. Count I charged the respondent with commingling client funds with funds of the Icelandic Consulate and failure to prepare a closing statement upon settlement of the claim. Count I further charged that the respondent had forged the endorsement of co-counsel on the settlement draft, and that the respondent had attempted to shield the settlement funds from Geldzahler's creditors. Count II charged respondent with engaging in dishonest conduct by representing to co-counsel that he had not received settlement funds on behalf of Geldzahler, when in fact respondent had re-

ceived them. Count III charged the respondent with repeatedly refusing to produce before the Administrator records related to his handling of the Geldzahler settlement funds.

The complaint alleged that the respondent's conduct violated the following provisions of the Code of Professional Responsibility: Rule 1—102(a)(3), which prohibits illegal conduct involving moral turpitude; Rule 1—102(a)(4), which prohibits conduct involving dishonesty, fraud, deceit, or misrepresentation; Rule 7—102(a)(7), which forbids an attorney to assist a client in conduct known to be illegal or fraudulent; Rule 9—102(a), which requires that an attorney deposit client funds into a separate identifiable trust account; Rule 2—106(c)(3), which requires that an attorney prepare a detailed closing statement setting forth the application of the contingent fee agreement; and Canon 9, which states that a lawyer should avoid even the appearance of professional impropriety. (107 Ill. 2d Rules 1—102(a)(3), 1—102(a)(4), 7—102(a)(7), 9—102(a), 2—106(c)(3), Canon 9.) The complaint further alleged that the respondent violated Supreme Court Rule 771 (107 Ill. 2d R. 771) by engaging in conduct which tends to defeat the administration of justice and to bring the courts or the legal profession into disrepute.

Respondent did not file an answer to the complaint. Consequently, the Hearing Board ordered that the allegations of the complaint be deemed admitted. The Hearing Board then ordered a hearing, at which it heard the testimony of Thomas Moore, the respondent's co-counsel in the Geldzahler claim. The respondent did not appear before the Hearing Board. The Hearing Board issued its report, finding that all of the misconduct alleged by the Administrator was proven by clear and convincing evidence, and recommending that respondent be disbarred. Respondent filed with the Review Board exceptions to

the report and recommendation of the Hearing Board. The Review Board adopted the Hearing Board's findings of fact and law, but recommended that respondent be suspended from the practice of law for one year. Respondent has filed with this court exceptions to the report and recommendation of the Review Board.

Respondent was admitted to the bar of Illinois in 1947. In addition to his legal practice, respondent serves as consul general for the Republic of Iceland. In 1982, the respondent agreed to represent Walter Geldzahler in connection with a claim on a disability insurance policy issued by INA Life Insurance Company. Walter Geldzahler is a United States citizen. His wife, Gudrun, is an Icelandic citizen. The respondent asked attorney Thomas Moore of the law firm of Kelly & Moore to join with him in representing Geldzahler. Geldzahler entered into a written contingent fee retainer agreement whereby he jointly retained the respondent and Kelly & Moore to prosecute the action against INA. Under the terms of the contract, attorney fees were to be one-third of the recovery. The respondent and Kelly & Moore orally agreed to a 50/50 division of the attorney fees.

In January 1984, Geldzahler agreed to settle his claim against INA for $35,000. The respondent and Moore agreed to reduce the attorney fees from the contractual one-third to $10,000. On January 15, 1984, the respondent received a settlement check in the amount of $35,000, payable to Walter and Gudrun Geldzahler, the respondent, and Kelly & Moore. The respondent then endorsed the settlement check in his own name, and in the name òf Kelly & Moore. The respondent deposited the check in the account of the Icelandic Consulate at the American National Bank & Trust Company of Chicago. The Icelandic consulate account holds funds of the Icelandic government and of Icelandic citizens and is used to pay expenses of the Icelandic Consulate. The respond-

ent testified before the Inquiry Board that because of the Geldzahlers' poor financial situation, he deposited the check in the Icelandic account, where it would be beyond the reach of the Geldzahlers' creditors until he could determine what, if any, rights the creditors might have against the settlement proceeds.

Also in January 1984, the respondent told Moore that the case had been settled, but that the attorney fees would not be disbursed until the Geldzahlers' financial problems were resolved. The respondent testified before the Inquiry Board that he did not wish to disburse the attorney fees immediately following the settlement because he feared that further litigation, including possible bankruptcy proceedings, and negotiations with the Geldzahlers' creditors might well have been required. The respondent further testified that following the settlement with INA Life Insurance Company, the respondent did in fact engage in negotiations with the Geldzahlers' creditors. Before the Hearing Board Moore testified that between January and September 1984, the respondent and Moore had several conversations concerning the settlement proceeds. Moore initially stated that "[h]e [the respondent] was never clear to me on whether or not he had received the check. It was my understanding that, due to creditors the Geldzahlers may or may not have had, I honestly don't know, that either he had not requested them [INA Life Insurance Company] to send the check or that he had the check but would not deposit it." Moore later testified, "now that I have seen my complaint again, it's clear to me that he [the respondent] had said all along that the check had really not been issued and he didn't want it issued because of the creditors and would I please wait." Also, between January and September 1984, a dispute arose between the respondent and Moore concerning the division of the attorney fees. The respondent determined that because he had done

the majority of the work on the Geldzahler case, the original agreement to divide fees equally had become inequitable. Eventually, Moore agreed to a 60/40 division, with the respondent to receive $6,000 and Kelly & Moore to receive $4,000.

In September 1984, the respondent informed Moore that the Geldzahlers had received their share of the settlement proceeds and that the respondent had withdrawn a portion of the respondent's share of the attorney fees in order to pay his taxes. The respondent refused at that time to pay Moore's share of the attorney fees.

On November 9, 1984, Moore filed a complaint with the Administrator, charging that the respondent had lied to Moore concerning issuance of the settlement draft and that the respondent had forged Moore's signature on the settlement draft. The Administrator requested that the respondent reply to the charge and that the respondent produce all records related to any funds received on behalf of the Geldzahlers. The respondent did not respond to the Administrator's request. Moore finally received his $4,000 fee by a check dated December 22, 1984, drawn on the consular account into which the gross settlement proceeds had been deposited.

Pursuant to a subpoena *duces tecum*, the respondent appeared before the Inquiry Board on June 21, 1985. He testified that he had told Moore in January 1984 that settlement funds would not be disbursed until the Geldzahlers' financial situation had been settled. He also stated that he would seek permission from the Icelandic Embassy for the release of the records requested by the Administrator, and that if permission were granted, he would transmit the records to the Administrator. The respondent did not transmit any such records to the Administrator.

On August 5, 1985, the Administrator issued a subpoena *duces tecum* to the American National Bank & Trust Company seeking release of account records of the Icelandic Consulate for the period from December 1979 through January 1985. On August 6, 1985, the respondent sent a letter to the American National Bank & Trust Company requesting that the bank, based on "well established rules of comity and international law," refrain from complying with the subpoena. On September 18, 1985, the Administrator again requested that the respondent produce the account records relevant to the Geldzahler settlement. The respondent did not comply with this request.

The Inquiry Board then voted its complaint against the respondent. The respondent did not file a written answer to the complaint, nor did he appear before the Hearing Board. The Hearing Board heard the testimony of Thomas Moore, and then found the allegations set forth in the complaint were proven by clear and convincing evidence. The Hearing Board recommended that the respondent be disbarred. The respondent filed exceptions before the Review Board. The Review Board adopted the findings of fact and law of the Hearing Board, but recommended that the respondent be suspended for one year. The respondent has filed before this court exceptions to the findings of the Review Board. We address herein the charges of the complaint.

We first address the charge and the Hearing Board's finding that the respondent forged the endorsement of co-counsel, Kelly & Moore, on the Geldzahler settlement check. The respondent admits that, in addition to his own name, he inscribed the firm name "Kelly & Moore" on the check. The respondent further admits that neither Kelly nor Moore had expressly authorized him to do so. The respondent argues, however, that the endorsement cannot constitute forgery because he, as a matter of law,

possessed authority to endorse the check in the name of co-counsel. The respondent additionally asserts that the record does not support a finding of an intent to defraud Kelly & Moore, and that the Hearing Board's finding of forgery is therefore erroneous.

Although the precise issue has not been previously addressed by this court, it appears well accepted in other jurisdictions that where lawyers between whom no general partnership relation exists jointly undertake to represent a client in a case, they may be regarded as joint venturers, or "special partners," for the particular transaction. (See *Duer & Taylor v. Blanchard, Walker, O'Quin & Roberts* (La. 1978), 354 So. 2d 192; *Brauns v. Housden* (1938), 195 Wash. 140, 79 P.2d 981; *Bailey v. Griggs* (1935), 174 Okla. 90, 49 P.2d 695; *Harris v. Flournoy & Flournoy* (1931), 238 Ky. 329, 38 S.W.2d 10; *Fitzgibbon v. Henry A. Carey, P.C.* (1984), 70 Or. App. 127, 688 P.2d 1367; *Bunn v. Lucas, Pino & Lucas* (1959), 172 Cal. App. 2d 450, 342 P.2d 508. See generally 46 Am. Jur. 2d *Joint Ventures* §24 (1969); Annot., 73 A.L.R.2d 991, §2 (1960).) "Thus, where an attorney retained on a contingent fee to prosecute a claim engages another lawyer to assist in the litigation, upon an agreement to share the fee in case of success, otherwise to receive nothing, they become joint venturers." (46 Am. Jur. 2d *Joint Ventures* §24 (1969). See *Mau v. Woodburn, Forman, Wedge, Blakey, Folsom & Hug* (1964), 80 Nev. 184, 390 P.2d 721; *Glover v. Maddox* (1958), 98 Ga. App. 548, 106 S.E.2d 288; *McCann v. Todd* (1943), 203 La. 631, 14 So. 2d 469; *Defrancesch v. Hardin* (La. App. 1987), 510 So. 2d 42.) We accept this characterization of the relationship between two attorneys, like the respondent and the firm of Kelly & Moore in the present case, jointly representing a client on a contingent fee basis. This court has defined a joint venture as an association of two or more persons to carry out a single enterprise

for profit. (*Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, 318; *Ditis v. Ahlvin Construction Co.* (1951), 408 Ill. 416, 426.) This definition aptly characterizes the relationship between the respondent and the firm of Kelly & Moore with regard to the representation of Walter Geldzahler.

This court has further held that partnership principles govern joint ventures (*Bachewicz v. American National Bank & Trust Co.* (1986), 111 Ill. 2d 444, 448; *Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 438), for a joint venture is essentially a partnership carried on for a single enterprise (*Bachewicz,* 111 Ill. 2d at 448; *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, 318). This court has recognized that a partner has implied authority to endorse negotiable instruments made payable to the partnership. (*Huston v. Newgass* (1908), 234 Ill. 285, 290; *Ryhiner v. Feickert* (1879), 92 Ill. 305, 311. See also *Link v. First National Bank* (1942), 312 Ill. App. 502, 509; *Grosberg v. Michigan National Bank—Oakland* (1984), 420 Mich. 707, 715, 362 N.W.2d 715, 719; *Lentz v. United States* (1965), 346 F.2d 570, 171 Ct. Cl. 537; 68 C.J.S. *Partnership* §161 (1950).) Section 9(1) of the Uniform Partnership Act (Ill. Rev. Stat. 1987, ch. 106½, par. 9(1)) similarly provides:

> "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority."

Based upon these principles we conclude that the respondent, by virtue of his relationship with the firm of Kelly & Moore, was invested with implicit authority to

endorse the Geldzahler settlement check in the name of Kelly & Moore. We recognize that we are not presented here with a typical partnership situation in which two or more individuals have embarked upon a series of enterprises comprising a general business pattern. In such situations, it can easily be presumed that the partners have conferred upon each partner the authority to act for the partnership in such a manner as is ordinarily attendant to carrying on partnership business. (See *Gray v. Ward* (1856), 18 Ill. 32, 34.) Here we deal with a single enterprise with a specific and singular purpose—the representation of a client. That authority implicitly conferred on each of the joint venturers is correspondingly narrow. Nonetheless, we find that the endorsement of the settlement check was necessarily incident to the adequate representation of Walter Geldzahler. Without such endorsement a check could not be promptly deposited into a separate identifiable client trust account in accordance with the mandate of the Code of Professional Responsibility. It is unquestionably the better practice to procure the separate endorsement of co-counsel on the settlement draft, or at least to obtain co-counsel's express authorization to endorse the draft in his or her name. Had the respondent done so here, the dispute which eventually gave rise to this disciplinary action may well have been avoided. We hold simply that where two or more attorneys are jointly retained on a contingent fee basis to prosecute a claim on behalf of a client, so that the attorneys' relationship may be characterized as a joint venture, it is not forgery for one of the attorneys to endorse, in the name of all the joint venturers, a settlement draft payable to all the joint venturers, for the purpose of facilitating a prompt deposit of the funds into a client trust account. The attorneys are free to alter this authority by express agreement. Nothing we hold here, however, should be construed as recognizing

any implied authority on the part of an attorney to endorse checks in the name of his or her client. (*In re Chernoff* (1982), 91 Ill. 2d 316, 325; *In re Dombrowski* (1978), 71 Ill. 2d 445, 450; *In re Di Bella* (1974), 58 Ill. 2d 5, 8.) The Review Board did find that the respondent had forged the names of the Geldzahlers on the settlement check. We observe, however, that this conduct was neither alleged in the complaint, nor supported by any evidence whatsoever in the record. Accordingly, this finding was erroneous.

The respondent asserts that the evidence fails to support a finding that the respondent intended to defraud Moore by affixing the name "Kelly & Moore" to the settlement draft. The respondent argues that the Hearing Board's finding of forgery was thus in error. We agree with the respondent on this point.

An essential element of forgery is an intent to defraud. (Ill. Rev. Stat. 1987, ch. 38, par. 17—3(a); see *In re Levy* (1987), 115 Ill. 2d 395, 399.) With respect to the crime of forgery the statute defines intent to defraud as "an intention to cause another to assume, create, transfer, alter or terminate any right, obligation or power with reference to any person or property." (Ill. Rev. Stat. 1987, ch. 38, par. 17—3(b).) In the present case, the evidence simply reveals that the respondent endorsed the name of co-counsel on the check so that he could promptly deposit the check and begin negotiations with the Geldzahlers' creditors. There is no indication that at the time of the endorsement the respondent sought to deprive Moore of his share of the attorney fees or to conceal the funds from Moore. At that time, Moore apparently agreed with the respondent that when the funds were received they should be held in their entirety until the Geldzahlers' financial situation had been fully ascertained. We recognize that the factual findings of the Hearing Board are entitled to a great deal of deference.

(*In re Ushijima* (1987), 119 Ill. 2d 51, 56; *In re Hopper* (1981), 85 Ill. 2d 318, 323.) However, we can find nothing in the evidence from which it can clearly and convincingly be inferred that, by signing the name "Kelly & Moore" to the settlement draft, the respondent intended to defraud or deceive Moore.

For essentially the same reasons we find that the endorsement, by itself, did not constitute "dishonesty, fraud, deceit, or misrepresentation" within the meaning of Rule 1—102(a)(4). In construing this rule this court has stated that "[f]raud encompasses a broad range of human behavior, including ' "*** anything calculated to deceive, *** whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture." ' " (*In re Armentrout* (1983), 99 Ill. 2d 242, 251, quoting *Regenold v. The Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 435. See *In re Alschuler* (1944), 388 Ill. 492, 503-04.) We certainly do not encourage the practice of endorsing checks in the name of co-counsel without co-counsel's knowledge or consent. However, we find nothing deceptive or dishonest, with respect to Moore, in the respondent's desire to quickly deposit the settlement check, or in the means chosen by the respondent to facilitate a deposit.

We do agree with the Hearing Board, however, that the respondent's subsequent dealings with Moore constitute unacceptable misconduct. The Hearing Board found that the respondent had repeatedly lied to Moore by telling Moore that the settlement check had not been issued. The evidence, consisting almost entirely of Moore's testimony, is certainly less than clear on the issue of whether the respondent had in fact blatantly lied to Moore concerning receipt of the settlement check. The evidence is clear, however, that the respondent displayed a woeful lack of candor with co-counsel. It was not until September 1984, some eight months after the respond-

ent had received the settlement check, that the respondent clearly informed Moore that the check had in fact been issued. By that time the respondent had disbursed the settlement proceeds due the Geldzahlers and had withdrawn a portion of the attorney fees to pay his own taxes. The respondent then refused to pay Moore that portion of the attorney fees to which Moore was unquestionably entitled. Finally, in December 1984, one month after Moore had filed his complaint with the Administrator, and nearly a year after the respondent had received the settlement check, the respondent paid Moore his fee. The respondent's lack of candor and his recalcitrance in response to Moore's requests for payment constitute conduct which falls far short of the honesty and integrity expected of every attorney. Such conduct clearly falls within the prohibition contained in Rule 1—102(a)(4).

The Hearing Board further found that the respondent violated Rule 9—102(a) of the Illinois Code of Professional Responsibility by depositing the settlement check into the Icelandic consular account. Rule 9—102(a) provides in pertinent part that funds belonging to a client "shall be deposited in one or more separate identifiable trust bank accounts." (107 Ill. 2d R. 9—102(a).) This court has held that this provision is mandatory, "admitting of no exceptions for any reason." (*In re Elias* (1986), 114 Ill. 2d 321, 332.) The Icelandic consular account is apparently in the nature of a trust account into which funds of the Icelandic government and Icelandic citizens are deposited and out of which expenses of the Icelandic Consulate are paid. The account apparently does not contain the respondent's personal funds. We observe that while the deposit of these funds into the consular account may technically not have constituted a violation of Rule 9—102(a), such handling of client funds certainly does violence to the purpose of that rule.

The respondent asserts that the "separate identifiable" provision of Rule 9—102(a) is satisfied when client funds are identifiably segregated from the attorney's personal funds. The respondent mischaracterizes the requirement of Rule 9—102(a). We have observed on many occasions that failure to comply with the express mandate of Rule 9—102(a) often leads to the commingling of client funds with an attorney's personal funds. This in turn often leads to the conversion of the client funds to the attorney's personal use or benefit. (*In re Elias* (1986), 114 Ill. 2d 321, 333; *In re Cohen* (1983), 98 Ill. 2d 133, 139; *In re Grant* (1982), 89 Ill. 2d 247, 253.) In the present case there is no evidence of a technical commingling. However, we have held that due to the danger of conversion, "it is essential that a client's money 'be held in such a manner that there can be no doubt that the attorney is holding it only for another and that the money does not belong to him personally.' " (*In re Stone* (1985), 109 Ill. 2d 253, 263, quoting *In re Clayter* (1980), 78 Ill. 2d 276, 281.) " '[A] covert method of handling a client's funds is highly unprofessional and *** can only create suspicion and harmful inference.' " (*In re Clayter* (1980), 78 Ill. 2d 276, 282, quoting *In re Lingle* (1963), 27 Ill. 2d 459, 463-64.) By placing the Geldzahler funds in the Icelandic consular account, the respondent was enabled to cloak these funds with a claim of consular immunity, thus placing the disposition of the funds beyond the scrutiny of the Administrator and of this court. When client funds have been so concealed, an ominous specter of impropriety necessarily overshadows the transaction.

This court has observed that Rule 9—102(a) is intended to guard not only against the actual loss of the funds but also against the risk of loss. (*In re Bizar* (1983), 97 Ill. 2d 127, 132.) The danger that an attorney may convert client funds to his personal use or benefit is

not the only risk which Rule 9—102(a) is designed to protect against. Whenever an attorney exposes client funds to extraordinary danger by failing to deposit the funds into an ordinary, separate and identifiable client trust account, he thwarts the objective of Rule 9—102(a). The Icelandic consular account is the account of a foreign government. The account holds funds belonging to that government, and unquestionably the Icelandic government possesses a great deal of control over the account. Consular expenses of the Republic of Iceland are paid out of the account. Not only the respondent, but the vice-consul as well, has access to the account. The respondent admits that the Icelandic account is not ordinarily used for the deposit of client funds. In short, by depositing the Geldzahler settlement funds into this account, the respondent has exposed those funds to extraordinary dangers, not the least of which are the incidents of the ever-changing nature of international relations.

When we state that the client's funds must be deposited in a separate, identifiable trust account, we do not mean that each client's funds must be deposited in a separate account. The rule is satisfied if a client's funds are deposited in an account identified as a client trust account, which is separate and distinct from an account in which the attorney has an interest.

The respondent testified before the Inquiry Board that one reason he deposited the funds into the Icelandic account was that Mrs. Geldzahler and the Geldzahlers' child were Icelandic citizens, and that they were planning to move to Iceland in the near future. The respondent stated that depositing the funds into the Icelandic account would more readily facilitate disbursement of the client funds. However unobjectionable the respondent's motives may have been in this respect, the mere ease with which client funds may be disbursed does not

justify handling such funds in the manner the respondent has chosen here.

The respondent admits that he deposited the check into the consular account in order to shield the funds from the Geldzahlers' creditors. The Hearing Board and the Review Board found this conduct to be improper. The Administrator likens the respondent's conduct to a fraudulent conveyance of property with the intent to hinder creditors. (Ill. Rev. Stat. 1987, ch. 59, par. 4.) The respondent asserts, however, that his conduct was entirely proper. The respondent argues that his duty as an attorney and as the consul general of Iceland was to protect the Geldzahlers' funds from possible attachment by creditors until the respondent could ascertain the amount and validity of claims against these funds.

The respondent correctly notes that he owes no duty to his clients' creditors equal or paramount to his obligation to his clients. (See *In re Harris* (1987), 118 Ill. 2d 117, 123; *Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 23.) The respondent, however, mischaracterizes, to some extent, his obligation as an attorney with regard to clients' funds. An attorney's obligation to protect his clients' funds certainly does not require that the attorney hide the funds from those who may have valid claims against the funds. There are proper forums for the determination of the validity of creditors' claims. If such claims are valid under the law, then the attorney has no right to obstruct their enforcement. If the claims are invalid, however, then there is no need to conceal the funds in the manner the respondent chose here. We must assume that the law will afford the clients all the protection to which they are entitled.

We find in the present case, however, that the respondent did not intend to defraud or deceive the Geldzahlers' creditors. We find nothing in the record to suggest that the respondent intended to permanently

deprive the creditors of any funds to which they may have been lawfully entitled. The respondent sought rather to protect the funds and avoid their attachment only until he could determine the amount and validity of the creditors' claims. There is no indication that any creditor was aware of the settlement proceeds or had sought to attach them. No creditor has complained about the respondent's deposit of these funds into the Icelandic account. There is simply no indication that the respondent's conduct was motivated by fraud or deceit, or anything other than poor judgment. See *In re Chernoff* (1982), 91 Ill. 2d 316, 324.

With respect to the respondent's repeated refusal to produce before the Administrator records of the Icelandic consular account related to the Geldzahler settlement proceeds, we agree with the Hearing Board and the Review Board that the respondent's conduct was clearly improper. The respondent's obstinance in response to the Administrator's repeated requests for cooperation constitutes conduct which tends to defeat the administration of justice and to bring the courts and the legal profession into disrepute. Respondent's obstinance has been demonstrated repeatedly throughout these proceedings. Such conduct clearly falls within the prohibition of this court's Rule 771.

The respondent argues that, under principles of international law, the records of the consular account were exempt from process and that the Administrator was, therefore, not entitled to such records. (See Vienna Convention on Consular Relations, *opened for signature* April 24, 1963, art. 61, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261.) The respondent further asserts that the breadth of the subpoena *duces tecum* issued to American National Bank was "excessive to the point of abuse," and that he was, therefore, justified in requesting that the bank not comply with the subpoena.

We need not address the validity of the respondent's claim that the Vienna Convention exempted from process the records of the consular account. Whatever the validity of that claim might be, it does not usurp the respondent's fundamental obligation as an attorney to cooperate with the Administrator in the investigation of possible acts of attorney misconduct. (*In re Weston* (1982), 92 Ill. 2d 431, 439-40. See *In re Brody* (1976), 65 Ill. 2d 152.) Nor is this obligation in any way affected by the respondent's capacity as consul general for the Republic of Iceland. This is not to say that the respondent's dual capacity as consul general and as an attorney licensed in this State is necessarily incompatible. We recognize rather that the respondent must not allow his consular position to interfere with his duties as an attorney. If the respondent was obligated to assert the privilege of consular immunity with respect to the records of the consular account, then it was certainly improper for him to deposit client funds into the account. If he was not so obligated, then the respondent should not have asserted the privilege in this instance because the privilege necessarily interfered with his obligation as an attorney to cooperate with the Administrator's valid requests with regard to the account records. While Mrs. Geldzahler and the Geldzahlers' child, both of whom are Icelandic citizens, may have had an interest in the settlement proceeds, it must be remembered that the nominal plaintiff in the claim against INA Life Insurance Company was Walter Geldzahler, an American citizen. It was in settlement of Walter Geldzahler's claim for disability benefits that the funds were disbursed. We find no merit in the respondent's assertion that he was entitled to utilize his capacity as the consul general of Iceland in order to hold inviolable funds belonging to an American citizen. With regard to the scope of the subpoena *duces tecum*, we note that had the respondent cooperated with

the Administrator's initial request for the records of the Geldzahler funds, it is highly unlikely that any subpoena would have issued. The subpoena was the result of the respondent's own refusal to cooperate with the Administrator. We will not permit the respondent to defend this lack of cooperation by attacking the breadth of the subpoena ultimately issued.

Finally, the respondent admits that he failed to prepare a written closing statement "setting forth in detail all information necessary to present a definitive statement of the application of the contingent fee agreement in the action," as required by Rule 2—106(c)(3) (107 Ill. 2d R. 2—106(c)(3)).

We note that no creditor of Geldzahler has complained of the respondent's handling of the settlement proceeds. Similarly, there has been no complaint from Geldzahler, his wife or child. This is purely a dispute between two attorneys concerning the division of fees. Several of the serious charges made by Moore could not be substantiated. By the same token, no complaint would ever have been filed with the Attorney Registration and Disciplinary Commission if respondent would have been candid with his co-counsel. Certainly, the manner in which respondent dealt with his co-counsel is deserving of sanction. Also, his stubborn insistence in impeding the disciplinary process and his lack of cooperation must not be rewarded. In addition, there are the deposit of the settlement check into a fund that does not qualify as a client trust fund for the admitted purpose of putting the proceeds beyond the reach of creditors, and the failure of the respondent to provide the client with a detailed closing settlement statement. We conclude that the sum of this conduct warrants a suspension from the practice of law for six months.

We have not imposed a more severe sanction because of respondent's 42 years of practice with an otherwise unblemished record.

*Respondent suspended.*

JUSTICE MILLER, concurring in part and dissenting in part:

With the exceptions noted below, I agree with the majority's resolution of the charges of professional misconduct brought against the respondent in this case, Paul Sveinbjorn Johnson. I do not agree with the sanction imposed by the majority in this case, however, and accordingly I dissent from that portion of the court's opinion.

The respondent and co-counsel, an attorney from a separate firm, agreed to represent the client, Walter Geldzahler, in a dispute involving a claim on a disability insurance policy. The matter was eventually settled. After endorsing the settlement check with the name of the other attorney, the respondent, who also served as the Icelandic consul general in Chicago, deposited the proceeds in the consulate's bank account, where they remained for a lengthy period of time, commingled with consulate funds. Following the deposit of the funds in the consulate account, the respondent repeatedly misled co-counsel about the status of the settlement. At some point the respondent withdrew at least part of his share of the fee in the matter and distributed to Mr. and Mrs. Geldzahler their portion of the settlement proceeds. After further delay, the respondent eventually paid co-counsel his fee, once the second attorney consented to accept a share that was smaller than the division the attorneys had originally agreed upon. The respondent maintains that he deposited the proceeds of the settlement in the consulate account so that the funds would be protected from the Geldzahlers' creditors. The respondent also as-

serts that Mrs. Geldzahler and the couple's child, who were Icelandic citizens, were planning to return to that country, and that placement of the settlement proceeds in the consulate account was intended to facilitate disbursement of the funds to them.

I agree with the majority that the respondent was implicitly authorized to endorse co-counsel's name on the settlement check, for the purpose of depositing the proceeds in an appropriate account. Such conduct would be consistent with the two attorneys' status as joint venturers in their representation of the client. Unlike the majority, however, I am not so ready to conclude in this case that the respondent's conduct in endorsing the settlement check was not fraudulent. It is difficult to square the respondent's claim of innocence with his decision to secret the funds in the consulate account and with his subsequent activity in misleading co-counsel about the status of the settlement.

Moreover, I do not agree with the majority's statement that the respondent's deposit of the settlement proceeds in the Icelandic consulate account may have been technically proper under Rule 9—102(a) of the Code of Professional Responsibility (107 Ill. 2d R. 9—102(a)). This court has held that the requirement that an attorney hold client funds in a separate, identifiable client trust account is an absolute obligation and allows no exceptions. (*In re Elias* (1986), 114 Ill. 2d 321, 332.) The rule serves to limit the possibility of commingling and conversion and "insures the safety and integrity of clients' funds while in the possession of an attorney." (*Elias*, 114 Ill. 2d at 333.) As the majority goes on to point out, the consulate account contained a variety of funds, and it was accessible to others in the consul, who apparently were not associated with the respondent in the practice of law. Deposit of the settlement funds in

the consulate account did not satisfy the mandate of Rule 9—102(a).

The majority's characterization of the present case as simply a fee dispute between two attorneys ignores the evidence of the respondent's misconduct with respect to his treatment of the client funds. I would note that the respondent's mishandling of the settlement proceeds is not attributable to careless bookkeeping or mere inadvertence; the majority correctly determines that the respondent's hopes of thwarting the client's creditors should not be condoned. Nor can the respondent's improper deposit of the client's funds in the consulate account be excused simply because the client acquiesced in that activity or was ignorant of what occurred. Contrary to the majority's view, it is of no significance here that the client did not complain about the respondent's representation and apparently was not harmed by it. The client had no reason to complain: he and his family were the intended beneficiaries of the respondent's actions. The respondent's misconduct was aggravated by his lack of cooperation in the present proceedings. The respondent failed to answer the Administrator's complaint, did not appear before the hearing panel, and resisted the production of records pertaining to the matter.

The Hearing Board recommended that the respondent be disbarred; the Review Board recommended that the respondent be suspended from practice for one year. The majority suspends the respondent for a period of six months. I believe that a six-month suspension is, on the present record, too lenient. Although the recommendations of the Hearing Board and Review Board are not binding on this court (see *In re Kitsos* (1989), 127 Ill. 2d 1, 10; *In re Hopper* (1981), 85 Ill. 2d 318, 323), I see no reason in the present case to impose a sanction that is less severe than the one-year suspension recommended by the Review Board.